McJUNKIN CORPORATION, Appellee,

v.

NORTH CAROLINA NATURAL GAS CORPORATION, Appellant.

No. 8308.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1961.

Decided June 12, 1961.

Argued on Rehearing Jan. 8, 1962.

Order on Rehearing March 19, 1962.

Dickson Phillips, Fayetteville, N. C. (McCoy, Weaver & Wiggins, and Donald W. McCoy, Fayetteville, N. C., on the brief), for appellant.

John H. Anderson, Jr., Raleigh, N. C., and A. G. Stone, Charleston, W. Va. (Willis Smith, Jr., Smith, Leach, Anderson & Dorsett, Raleigh, N. C., and Blagg, Stone, Mauzy & Bowles, Charleston, W. Va., on the brief) for appellee.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and HARRY E. WATKINS, District Judge.

HARRY E. WATKINS, District Judge.

This is an action brought by plaintiff, McJunkin Corporation, to recover damages from defendant, North Carolina Natural Gas Corporation, for breach of contract to purchase an order of steel pipe. At the conclusion of all the evidence before a jury, the court directed a verdict for the plaintiff in the amount of $123,493.88. The only question raised on this appeal is whether the trial court was justified under the law and evidence to direct such verdict. We think the directed verdict was proper and affirm the judgment.

There is little, if any, conflict in the material facts. The controversy arises over the legal effect to be given certain letters exchanged between the parties, which plaintiff contends amounted to a quotation by plaintiff, an unqualified purchase order by defendant based upon such quotation, certain deletions agreed to by the parties, and an unqualified acceptance by plaintiff of such purchase order as so revised. Defendant says that the contract sued on was not, as the trial court held, a complete and binding contract, enforceable by plaintiff as a mat-

ter of law, but that it was "conditional" and subject to unilateral cancellation.

On December 7, 1955, defendant was authorized to do business in North Carolina as a public service corporation, and needed money, gas and pipe. Banks and insurance companies would lend money, but required a showing of a guaranteed source of gas and pipe. In March, 1957, the Federal Power Commission authorized an allocation to defendant of forty million cubic feet of gas per day. Because of limited steel capacity and extraordinary customer demand, assured delivery of pipe was a major problem. Line pipe in diameters greater than 4 inches was especially difficult to obtain. Pipe is sold by weight and, for economic reasons, defendant insisted upon pipe of thinner wall thickness than was made by most mills.

Plaintiff does not manufacture pipe, but sells large quantities of pipe to natural gas companies, much of which is shipped in carload lots direct from the steel mill to the user. The established price is the mill price or manufacturer's price at date of shipment. The profit or functional discount allowed plaintiff and other suppliers in 1957 and 1958 was 5 per cent of the price f. o. b. the mill. Industry and trade journals publish the prevailing prices currently. Because of the shortage of steel in 1957, plaintiff and other such companies selling pipe were placed on an allotment by the steel mills. For example, Jones & Laughlin Steel Company allotted a certain amount of steel to the plaintiff to sell and when that was sold, there was no more available.

R. A. Ransom, a consulting engineer, was employed to present defendant's case to the Federal Power Commission, to secure or recommend all materials for the pipe line, and to supervise the construction of the pipe line. Ransom knew that plaintiff had connections with manufacturers of pipe, and communicated with representatives of plaintiff to secure pipe. After considerable correspondence, Ransom met with plaintiff's sales manager, Sample, and Wehrle, its assistant to the president, on March 22, 1957, to discuss defendant's pipe requirements and plaintiff's ability to supply them. On March 29, Ransom wrote defendant's vice president, Kyle, stating that Biddison, president of the defendant, had instructed him (Ransom) to notify plaintiff that "we will purchase the pipe from or through them," that a purchase order "now appears to be in order," and that "shipping instructions will be furnished later." The letter stated that the cost to defendant would be the mill price at date of shipment, plus freight from the nearest competitive mill. The letter also listed the sizes and quantities of the pipe required.

Upon receipt of this letter, Kyle, on April 9, 1957, wrote plaintiff that its proposal to Ransom "relative to the pipe for the North Carolina project to be shipped to his specifications and construction date requirements is hereby accepted." On April 12, Kyle wrote Ransom, notifying him of the "acceptance" of plaintiff's proposal. Kyle, vice president of defendant, testified that he considered his letter of April 9 an agreement for the purchase of its pipe requirements, and if there had been no revision thereof, he would have continued to consider the agreement in force and effect.

Plaintiff took the position that the letters were not in enough detail, and wanted its commitment "spelled out more exactly, * * * because at this particular time pipe was unavailable practically and we had to be definite exactly what requirements we were committed to." Ransom had told plaintiff to put down on the quotation "what you feel you can offer, so that we will be completely clear on it, and we will follow up with a detailed order." To "spell out" the agreement in more detail and to take care of certain changes in the quantities and size of pipe suggested by defendant, plaintiff on July 3, 1957, submitted its formal quotation No. P-2469, based on the latest information from Ransom, listing in detail quantities and description of pipe, and prices for each. However, the quotation provided as follows:

"Prices shown on any quotation, or on any order or acceptance of order, are subject to governmental price regulations and to change, based on increase or decrease in manufacturer's price as of date of shipment."

This quotation was promptly accepted by defendant in a purchase order letter dated July 11, 1957, which reads as follows:

"Please accept this letter as your purchase order for our pipe requirements, as outlined hereafter, and in general accordance with your quotation Number P-2469."

The purchase order specified in detail the quantity, description, price and shipping period for each size of pipe to be shipped between the dates October 15, 1957, to January 30, 1958, the larger transmission pipe to be shipped first, and the smaller pipe for distribution lines to be shipped later. While the quotation listed quantities of X-grades (10¾" and 12¾") of pipe, both parties understood and intended that defendant was to order these sizes, as well as the 16" pipe direct from the mill. Defendant's letter of July 17, 1957, eliminated the 10¾" and 12¾" sizes from the order, this being done by mutual agreement.

For some time, plaintiff had been spending much time and effort to locate the type of pipe needed by defendant, and immediately placed the order with Jones & Laughlin, a manufacturer of pipe. Just as soon as the mill acknowledged the order, plaintiff, by letter dated August 5, 1957, accepted defendant's purchase order of July 11, 1957, from which the X-grades of pipe had been deleted. The letter from Wehrle to Kyle, vice president of defendant, stated:

"Thank you for your letter of July 11 accepting our quotation P-2469 for your pipe requirements on this project.

"We have deleted the two items of transmission pipe in accordance with your letter of July 17. Our mill, Jones and Laughlin Steel Corpora-

tion, has entered these requirements in their mill schedules.

"We certainly appreciate this order and if we can be of any other service, please call us."

Plaintiff had been notified by the mill that "once orders are in for this job, we will not have any pipe for you on other jobs. We look to you to sell this, and this is going to wipe you off our books during this crowded period of time." Plaintiff elected to sell its quota to defendant, although it could have delivered to someone else. At that time, all of plaintiff's mills were allocating material, and at that time plaintiff was sold out with other mills.

■ This letter of August 5, 1957, was the culmination of a binding and subsisting contract between the parties, not ambiguous, conditional or indefinite in any manner, and binding on the defendant to purchase and the plaintiff to furnish the pipe dedicated and committed to plaintiff out of the limited quantities of pipe allocated to it by the mill in 1957. Plaintiff was thereby forced to pass up the opportunity to sell to other customers during that period, as the contract exhausted its allotment during the last quarter of 1957.

Plaintiff's formal and detailed quotation of July 3, 1957, defendant's purchase order letter of July 11, 1957, amended on July 17, 1957, by mutual consent to eliminate the "X grades" and, finally, plaintiff's letter of acceptance, dated August 5, 1957, constituted the contract. Many other circumstances, including defendant's earlier purchase agreement letter of April 9, 1957, the scarcity of pipe at the time, and the allotment of pipe by the mill, all tend to corroborate the actions and motives of the parties, as shown by these four documents. They show the eagerness of defendant to obtain a definite commitment from a responsible supplier, and how such commitment was finally obtained. Kyle, the only officer of defendant to testify, was asked: "When you received the letter from Mr. Wehrle of

August 5, and from that time on, you knew that McJunkin Corporation had committed itself to furnish your company the pipe referred to in your letter of July 11 upon the terms of your letter of July 11? A. Yes." Elsewhere, Kyle testified that he had "obtained a commitment for the pipe," and that he wished it "tied down" to his satisfaction. He also testified that "everything was set and accomplished for the delivery of the pipe, except the time."

The early negotiations with plaintiff were based on "the plan of the Company (defendant) to complete its financing in the very near future" and upon its expectation that the project would "go forward rapidly, with construction to start" in the fall of 1957. However, late in 1957, after the contract of purchase had been completely executed, defendant encountered delays in its financing. It was about September 24, 1957, when plaintiff first learned about this. Delivery was to begin October 15. At defendant's request, plaintiff agreed to postpone delivery to November 15, 1957, then to January 1, 1958, and through meetings, telephone conversations and correspondence, the parties mutually agreed to delay the time for deliveries for an indefinite period under the contract, until defendant's money should become available. Plaintiff kept Jones & Laughlin advised as to the developments. At all times after acceptance of defendant's purchase order, plaintiff was "able, ready and willing" to sell and deliver the pipe under its contract and commitment.

While plaintiff was still waiting to be informed of the success of defendant's financing, and for defendant to set a date for delivery, Kyle, without notice or explanation of any character, sent a brief cancellation letter, dated May 27, 1958, the first sentence of which stated: "This letter will constitute cancellation of the line pipe ordered from you in our letter of July 11, 1957."

While defendant was seeking delay in the date of delivery, and while the date for delivery remained indefinite, there was a radical change in the pipe market.

Within a few weeks in the latter part of 1957, all sizes of pipe became readily available. Foreign pipe invaded the market. Commission brokers of all type, including a former director of the defendant, were selling pipe and were willing to pass on to the buyer nearly all of their profit. One witness for the defendant, Sholar, testified that during the latter part of 1957, (before the cancellation date), he, a supplier, talked to the defendant about passing on to defendant 4 per cent of his 5 per cent discount, and that later he sold considerable pipe to defendant on this basis. He did not remember when, with reference to the cancellation date of May 27, 1958, that he made a definite proposition to pass on this discount and get the order for pipe on that basis. In the summer of 1958, defendant committed itself to purchase three-quarters of a million dollars worth of pipe from other companies and as of September, 1958, had commitments aggregating several million dollars worth of pipe from other companies. Defendant completed its financing in October, 1958. Kyle, the vice president of defendant, said he did not know how much his company saved by cancelling the order with plaintiff and buying elsewhere. He testified that before writing the cancellation letter, he consulted counsel and the president of his company. He did not deny, but could not remember, that the lower prices were a motive for cancellation. The record strongly indicates that defendant's action was a calculated risk, and that it took into account the large savings realized by shifting its purchases to the lower priced foreign pipe.

The cancellation letter was received by plaintiff on May 29, 1958, and by letter and telegram, plaintiff notified defendant that it would be held accountable for the breach of contract. On June 13, plaintiff wrote defendant as follows:

"On October 9, 1957 we wrote you delaying delivery until 1958 on your order of July 3, 1957. This was delayed at your request due to your financing not having been completed.

"We now understand that the insurance companies have made commitments and that your financing will be completed early to mid-August. In order to meet the construction requirements after funds are available, it will be necessary for you to advise us as to desired date of delivery, the order in which the different sizes of pipe are required, and any other relevant information."

Defendant replied on June 18, 1958, as follows:

"This will acknowledge receipt of your letter of June 13, 1958, requesting the date of delivery of our pipe requirements. We refer you to our letter of May 27, 1958, in which all of the remaining pipe on order with your Company for North Carolina Natural Gas Corporation was cancelled,"

to which plaintiff immediately replied:

"We are holding your company fully responsible for its obligations under that agreement."

This action was instituted September 15, 1958. The mill price on pipe was increased August 4, 1958. By letter dated September 11, 1958, defendant, through Ransom, asked plaintiff for quotations on defendant's requirements, although the requirements listed were much less than set forth in the purchase order of July 11, 1957. On October 6, 1958, plaintiff expressed a willingness to negotiate and settle the pending litigation on the basis of defendant's reduced requirements. In that letter, plaintiff stated "that it must be definitely understood that McJunkin Corporation stands on its existing contract and that it will be necessary to process any settlement of the pending litigation, however arrived at, through our local attorney, * * *" There was no reply to this letter.

There is an additional circumstance upon which defendant relies. A few days before May 27, 1958, plaintiff found itself able until May 29, 1958, to supply defendant with X-grades of pipe (10¾", 12¾" and 16" sizes). An advance in steel prices seemed imminent. The date to secure this additional pipe was about to expire, and on May 27, 1958, which was the exact date of cancellation, plaintiff wrote a letter to Ransom, which listed quantities of pipe from 3½ inches to 16 inches in diameter, which plaintiff offered to sell defendant, the quantities based on defendant's recent downward revision of requirements. Defendant urges that this offer of plaintiff evidenced an abandonment of, or lack of belief in, its existing contract. Plaintiff explained that the purpose of this letter was to add the quantities of the larger pipe to its existing contract.

■■ There is no merit in the contention of the defendant that the evidence raises alternate inferences (1) that the parties never entered into a contract because it was "preconditioned" on the financing of defendant, or (2) that the contract was "executory" and, therefore, subject to the continuing right of unilateral cancellation. Aside from the principle that the construction of a written contract is for the court, no such inferences could reasonably be drawn from the evidence. While financing and payment are always matters of consideration, there is no evidence that this contract was not fully and unconditionally consummated. The evidence indicates that when the contract was closed, both parties expected the financing to be effected imminently, and provided definite dates for early delivery without any thought of financial difficulties. Nothing was said in any of the letters which could possibly be construed to provide that financing was a condition precedent to the contract. In fact, the matter of financing was not mentioned in any of the letters or papers exchanged between the parties and forming the written integrated contract. Neither is there any evidence that the matter of making financing a condition precedent to a binding obligation was ever mentioned in any of the conferences leading up to the written contract. Defendant simply asserts that such was the general understanding, despite the fact there is no evidence,

oral, or written, to support such assertion, and despite the fact that none of the papers constituting the written contract contained any reference whatever to financing. Instead, the written contract finally consummated on August 4, 1957, provided, unconditionally and in detail, for shipment of steel on specified dates, and the price to be paid therefor without any conditions. It was after August 4, 1957, when the parties talked and wrote about financing.

Defendant would gain solace from the evidence of Wehrle, wherein he stated that he had written a letter to Jones & Laughlin on September 24, 1957, stating that "At the present time delivery on this project depends on funds being made available." After the contract had been consummated on August 4, the plaintiff learned in September that defendant was having difficulty in securing its money, and defendant asked plaintiff to delay the delivery date from time to time until funds were available, and this was agreed to by plaintiff. On cross-examination, Wehrle made it clear more than once that "time for delivery was dependent on financing;" that "We were bound to them, committed to ship;" and "The time for delivery was dependent on completing financing, but we felt committed as a company to ship this pipe from April '57 until it was breached." Except for evidence of general custom mentioned hereafter, no other witness testified as to the intention of the parties relating to financing. The statements of Wehrle, asked on cross-examination concerning the intent of the parties as to financing, remain uncontradicted.

■ Some effort is made by defendant to show that by a general trade usage or custom this purchase order was on a "purely tentative, unilaterally, cancellable basis." The trouble with defendant's case here is that it was unable to show such custom or usage, at least with respect to contracts of this sort with brokers. Defendant's evidence relates primarily to custom among manufacturers. Indeed, one of defendant's officials testified that he regarded the original agreement prior to its amendment as creating an immediate binding obligation upon his company. The testimony also shows that the whole purpose of the contract was to demonstrate to financial institutions a firm guaranteed source of supply; a purported contract unilaterally cancellable by either party would have served no such purpose. The proof did not establish a custom or usage from which a trier-of-fact could find a condition precedent that each party had a unilateral right of cancellation until financial arrangements were completed.

■ Defendant takes issue with the phase of the verdict which involves a deduction of $2,000.00 from the total discount of $125,493.88 (calculated at 5%) to cover additional expense which plaintiff would have incurred had the defendant performed the purchase contract. Wehrle testified that such expense would not have exceeded $2,000.00 to cover billing and all other expense incidental to the fulfilment of the contract. Such a figure could not have been demonstrated with mathematical certainty. The court deducted that amount, the only figure mentioned in the evidence from the total commissions.

Defendant also claims that the wrong discount or commission was used in figuring a part of the damages. It admits that in 1957 (when the steel was ordered), and on May 27, 1958 (when the contract was repudiated), and on September 15, 1958 (when this action was instituted), and up to January 1, 1959, plaintiff's discount was 5 per cent. It claims that on January 1, 1959, plaintiff's discount was reduced to 3 per cent; that the other companies delivered 58 per cent of the steel prior to January 1, 1959, and 42 per cent thereafter; and that the court should have accepted these delivery dates by other companies as the dates of delivery by plaintiff in fixing the amount of plaintiff's discount. In the directed verdict all damages were based upon the 5 per cent discount in effect at the time of breach without regard to when other companies were able to make deliveries.

In those cases where a time for performance is fixed by the contract, and a breach occurs before the date fixed for performance, this is called an anticipatory breach of contract. In that event the party aggrieved may sue immediately to recover full damages, and the weight of authority or the general rule, subject to some exceptions, is to the effect that damages are to be assessed on the basis of profit factors existent at the time of performance fixed by the contract. The anticipatory repudiation does not cause the repudiated promise to be treated as if it were a promise to render performance at the date of repudiation. Repudiation does not accelerate the time fixed for performance; nor does it change the damages to be awarded as the equivalent of the promised performance. Restatement, Contracts, Sec. 338, comment (a).

The facts, as set out above, show that, at the time of the breach by defendant, the contract was one with an indefinite date of delivery. The law is clear as to the date on which damages are to be computed with respect to breach of contracts with indefinite delivery dates:

"The time for delivery of goods under an executory contract of sale may be indefinite or not fixed, either by the terms of the contract or by the subsequent agreement of the parties, as where the time of delivery is extended indefinitely. In any case, where the time for delivery, for the reasons mentioned or for other reasons, is not at some fixed date, it is obvious that the measure of the seller's damages for breach of the contract by the buyer cannot be based upon the difference between the contract price and the market value at the time fixed for delivery. In the circumstances, the date for delivery will be assumed to be the time when the buyer definitely repudiates or renounces the contract, or wrongfully refuses to accept the goods, and the damages will be assessed at the difference between the contract price and the market value at the time of the breach and at the place of de-livery. * * * The market value of the goods at the time the buyer refuses absolutely to receive them is determinative of the damages where the time for delivery is not fixed by the contract but is to be determined by the purchaser, since the refusal to receive the goods implies a refusal to fix a time for their delivery." 46 Am.Jur. Sales, § 618.

It is interesting to note that after the first cancellation letter of May 27, 1958, defendant explicitly refused to set a date for delivery as requested by plaintiff's letter of June 13, 1958. On June 18, 1958, defendant wrote plaintiff:

"This will acknowledge receipt of your letter of June 13, 1958, requesting the date of delivery of our pipe requirements. We refer you to our letter of May 27, 1958, in which all of the remaining pipe on order with your company for the North Carolina Natural Gas Corporation was cancelled."

Defendant urges that if the date of performance (delivery) was uncertain at time of breach, but became certain at the time of trial, damages should be computed as of the time of performance. It then follows with the argument that at the time of trial of this case the date of delivery by these other companies was known, and that the court should accept their delivery dates as the date plaintiff would have delivered, in fixing the amount of plaintiff's discount. Accepting, but not deciding the legal principle advanced, there is no merit whatever in this contention. Irrespective of whether the contract in effect at time of breach provided a definite or indefinite date of performance, or whether the trial took place before or after defendant accepted deliveries from other suppliers, the case must be affirmed on the facts.

The contract originally provided definite dates for delivery for each size of pipe. All of the pipe, except distribution pipe, was to be delivered between November 1 and December 30, 1957, and the distribution pipe was to be delivered

between November 1, 1957, and January 30, 1958. Prices were to be based on manufacturer's price as of date of shipment. Deliveries were indefinitely deferred at the request of defendant until defendant's money should become available. On May 27, 1958, the date of breach, and on September 15, 1958, when this action was instituted, defendant's money had not then become available.

The written contract provided that the sale was f. o. b. at point of shipment and responsibility of plaintiff ceased upon delivery of property to carrier. The date of performance was, therefore, the date of shipment by McJunkin, not the date of shipment by some other dealer or manufacturer. If this contract had not been cancelled by defendant, when would McJunkin have made shipment in the normal course of events? Defendant seeks to hold McJunkin to the dates that other suppliers made shipments under other substituted contracts, and under different conditions in their plants.

Defendant received its money on October 15, 1958. The following appears in the testimony of Kyle, vice president of defendant company:

"Q. Now, when, in relation to that financing date, did your deliveries of steel pipe commence?

"A. It commenced within thirty to forty-five days after that date.

"Q. How fast did you take the pipe thereafter?

"A. As Mr. Ransom testified, we got 58 per cent of it in that year, 1958, in November and December.

"Q. WHAT WAS DETERMINING THE RATE AT WHICH YOU WOULD TAKE THE PIPE AT THAT TIME?

"A. THE AVAILABILITY OF PIPE AND THE ABILITY OF THE STEEL MILLS TO FURNISH IT.

"Q. Was the pipe being used in the project as it was shipped?

"A. Yes; we let contracts. As soon as the financing was completed, we went right to work advertising for bidders on the pipeline. We had some forty bidders who presented bids within thirty days, and the pipe was coming in, and we awarded the contract to the lowest bidder; and I might say we purchased all the pipe from the lowest bidder in order to protect our certificate. Work actually started on the project in December, 1958, construction work."

Plaintiff was never consulted about any of these delivery schedules. It had specifically asked defendant subsequent to date of breach to let it know when it could accept deliveries and defendant refused to set any such dates. Had defendant not cancelled its contract, it would not have been necessary for it to advertise for bidders of pipeline, or for the defendant to process forty bidders, and award contracts, causing a delay of 30 to 45 days. Notwithstanding this delay, 58 per cent of the pipe was furnished by these new suppliers under new contracts in a period of about six weeks. There had been much delay, defendant was most anxious to get started, it had its money and was ready to accept delivery. Defendant asserted that the only factor which determined the rate of delivery was the availability of pipe with these other mills, and the ability of these other steel mills (not Jones & Laughlin or McJunkin) to furnish it. Kyle, the only officer of defendant who testified, did not claim that delivery was in any way based upon its "construction progress," as defendant now asserts. Neither did defendant claim at trial that its money was not available, or that it was not ready to receive the steel on October 15, 1958.

At the time of the breach, and continuously until date of trial, the allocated steel was still included in the Jones & Laughlin production schedule, and Jones & Laughlin and McJunkin stood willing and ready to make delivery. Had defendant let McJunkin know about the progress in its financing, as it promised to do, there is no reason whatever shown in the record why McJunkin could not have made delivery on October 15, 1958, or, in any event, prior to January 1, 1959.

Plaintiff was selling its bonds to insurance companies and distributed a prospectus which stated that defendant entered into its bond purchase agreement on September 16, 1958, and also stated that as of that date, September 16, 1958, it had commitments for purchase of steel aggregating $4,455,873.

There is no evidence in the record to indicate that McJunkin could not have made shipment of this entire order in 1958 had it been given an opportunity to do so. The only evidence on this subject offered by defendant is the dates on which other companies made deliveries. If this evidence is even relevant or admissible, it is certainly of little, if any, value. There is considerable evidence, mentioned above, to indicate that McJunkin could have made shipment of the entire order in 1958. It agreed only to a delay until defendant's money would be available, later determined to be October 15, 1958. If the date of performance by plaintiff became definite before trial in 1960, and that date would have been during 1958, the discount rate would be 5 per cent, the same as it was at date of breach, and it is not necessary to decide which date is the proper date to measure damages.

■ If, however, there is no evidence in the record to show when McJunkin (not the other suppliers) would have made delivery f. o. b. at mill in the normal course of events, had the contract not been cancelled, then the date of performance would still remain indefinite at date of trial, and under all authority, where date of performance is still indefinite at date of trial, there can be no price set or no commission figured as of date of performance because there is no such date. In that event, all authorities say that the date of breach determines the amount of damages.

■ Under the most liberal interpretation of the evidence from defendant's point of view, the date of shipment of this steel under this contract by McJunkin, if the contract had not been cancelled, was indefinite at date of trial. Had a jury substituted the date of actual delivery by other dealers and other mills under different contracts and other conditions for the dates that plaintiff would have shipped, and based its finding solely on that evidence (the only evidence to support such theory), such verdict would not stand. Consequently, under the evidence in this record, whether the date of performance was definite or indefinite at date of trial, the discount would be 5 per cent.

■ The measure of seller's damages is such as may reasonably be said to have been in the mutual contemplation of the parties at the time of the execution of the contract. This is the guiding principle, and to secure this result different rules of measurement of damages are resorted to as the peculiar circumstances of the particular case may require in order that all indemnity, and no more, may be awarded for the breach. 44 A.L.R. 217. The record shows that 5 per cent discount was at all times contemplated, notwithstanding any change in the price of steel. It was contemplated that the price of steel might change, and provision was made for that factor, but it was never contemplated that the commission would be reduced to 3 per cent.

■ It was no fault of McJunkin that the exact date McJunkin would have shipped is indefinite. It was not given an opportunity to ship on October 15, 1958, when defendant's money became available. Instead of accepting steel from McJunkin when its money was available, defendant began to advertise for new suppliers, causing the additional delay of 30 to 40 days in processing 40 bids and entering into new contracts. The record is clear that this was done with full knowledge on the part of defendant that it would be required to pay the 5 per cent commission to McJunkin, but would be able to eliminate the existing escalator clause in the McJunkin contract as to manufacturer's cost, and also have a rebate of 4 per cent of the prevailing 5 per cent commission. It was a calculated risk after advice from counsel, and there is good reason to be-

**804**

lieve that on May 28, 1958, when the cancellation letter was written, that defendant firmly believed that it would save more than the 5 per cent commission which was due plaintiff. And there is reason to believe that it did actually save as much, if not more, than the commissions due McJunkin. All the authorities are in accord in saying that the courts seek to place the party wronged, as nearly as can be done, in the same situation with respect to the contract as its performance would have placed him. See 44 A.L.R. 217, where it is stated:

> "while there are certain general principles according to which the damages to the seller are to be estimated, yet there is, nevertheless, a considerable degree of elasticity in their application. In a sense, each case is sui generis; hence, it is necessary to look to the facts to determine what particular rule for the assessment of damages will be just to the parties."

■ Furthermore, there was no reduction in the functional discount. Effective January 1, 1959, the steel mills announced a "new plan of distribution," by which distributors, such as McJunkin, became agents of the mills on a commission basis and were no longer merchants buying and reselling on their own account. On January 1, 1959, the distributor's profit margin was changed from a 5 per cent functional discount to a 3 per cent agency commission. This was, no doubt, due to the fact that under the agency arrangement the risks of collection were no longer with the distributor but were carried by the mills. This new plan did not become effective until more than 7 months after repudiation by defendant, after which plaintiff was never given the opportunity to agree with defendant as to date of performance, which it had the right to do. As between plaintiff and defendant, plaintiff is entitled to 5 per cent when it comes to figuring its damages.

There is not sufficient evidence to support a finding of a 3 per cent commission under any rule of damages. The amount claimed and allowed by the District Court was based upon a commission of 5 per cent on the old price of steel in effect on May 28, 1958 (date of breach), and not on the increased price of steel which went into effect on August 4, 1958. There being no evidence to support a 3 per cent commission, and the court having calculated the commission on the lower price of steel, there is no merit in this assignment of error. Since we decide this question of amount of discount on the basis of insufficiency of evidence, it is not necessary to decide what measure of damages rule is applicable, or whether the law of North Carolina or West Virginia applies.

Affirmed.