**WILLIAM B. TANNER CO., INC., and Pepper & Tanner, Inc., Appellees,**

**v.**

**WIOO, INC., Appellant.**

**No. 75–1149.**

United States Court of Appeals, Third Circuit.

Argued Sept. 19, 1975.

Decided Nov. 26, 1975.

William M. Gross, Edgar R. Casper, Krank, Gross, Notturno & Casper, Harrisburg, Pa., for appellant.

Robert D. Hanson, Harrisburg, Pa., for appellees.

Before SEITZ, Chief Judge, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This breach of contract action in the context of the radio industry requires us to resolve questions concerning the authority of an employee to bind his principal, the occurrence of an anticipatory breach, and the damages recoverable following such breach. We hold, as did the district court, that the employee had apparent authority to contract on behalf of the radio station and that an anticipatory breach of the contract did occur. However, we reverse the district court's determination as to the damages resulting from this breach.

## I. PROCEDURAL HISTORY AND FACTS

Plaintiff William B. Tanner Company (Tanner) commenced this diversity action against defendant WIOO, Inc. (WIOO) in the United States District Court for the Middle District of Pennsylvania. Tanner is a Tennessee corporation which produces promotional and advertising services for use by radio stations throughout the country. WIOO is a Pennsylvania corporation doing business as a licensed radio station in Carlisle, Pennsylvania.

In its complaint Tanner claimed that it had produced radio jingles and promotions for WIOO under five licensing contracts for which it had not received full

compensation.[1] F. Eugene Waite (Waite), an employee of WIOO, executed each of the contracts allegedly on behalf of the station. Under all but one of these agreements, Tanner was obligated to furnish various promotional materials to WIOO in return for cash payments and a specified number of one-minute spots.[2] A "spot" is a segment of radio time sold for advertising purposes. The five contracts purported to grant Tanner a large number of one-minute spots which were to be "valid until used."

After a trial without a jury, the district court filed an opinion which included the following findings of fact and conclusions of law:

(1) that Tanner had failed to establish by a preponderance of the evidence that Waite possessed actual authority to sign the contracts on behalf of WIOO;

(2) that Tanner established by a preponderance of the evidence that WIOO created in Waite apparent authority to bind the station under the contracts;

(3) that WIOO's conduct constituted an anticipatory breach of the contracts;

(4) that Tanner unreasonably delayed enforcement of Contracts Nos. 1 and 4 and therefore only Contract No. 5 was before the court;[3]

(5) that Tanner was entitled to damages of $12,628 on Contract No. 5

measured by the monetary value of 1560 one-minute spots and an outstanding cash obligation of $928.

A judgment filed July 15, 1974 was entered in favor of the plaintiff Tanner in the amount of $12,628 plus interest. Thereafter, WIOO moved to vacate or amend the judgment or for the grant of a new trial. On December 13, 1974, the district court denied WIOO's motion. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## II. CHOICE OF LAW

■ Since the district court had jurisdiction on the basis of diversity of citizenship, we are bound by the choice of law rules of the forum state, Pennsylvania. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ All of WIOO's and Waite's actions which are relevant to a finding of apparent authority occurred in Pennsylvania. Whether Tanner relied on these actions in Pennsylvania or Tennessee need not concern us because both Pennsylvania and Tennessee adhere to the doctrine of apparent authority as expressed in the Restatements (First and Second) of Agency. Accordingly, we feel free to apply Pennsylvania law in the resolution of this issue.[4]

---

1. The license agreements in issue are those dated May 10, 1966 (Plaintiff's Exhibit No. 1), February 2, 1967 (Plaintiff's Exhibit No. 2), August 21, 1967 (Plaintiff's Exhibit No. 3), September 21, 1967 (Plaintiff's Exhibit No. 4), and August 15, 1969 (Plaintiff's Exhibit No. 5). Each of these agreements will hereinafter be referred to as "No. —."

2. Contract No. 4 provided for payment to Tanner only in spots.

3. The district court interpreted the contracts as providing that No. 3 superseded and cancelled No. 2, and that No. 5 superseded and cancelled No. 3. Therefore, at the time this action began, Tanner could only sue under Contracts Nos. 1, 4, and 5. Tanner did not cross-appeal. Hence, only Contract No. 5 is at issue on this appeal brought by WIOO.

4. Restatement (Second) of Agency § 27 (1957) provides:

Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

See Restatement of Agency § 27 (1933); Reading Company v. Dredge Delaware Valley, 468 F. 2d 1161, 1163 (3d Cir. 1972); Revere Press, Inc. v. Blumberg, 431 Pa. 370, 246 A.2d 407, 410 (1968); Jennings v. Pittsburgh Mercantile Co.,

■ Furthermore, Pennsylvania is the place of performance under the contracts. Although this point is not free from doubt, we interpret Pennsylvania law as providing that "matters connected with the performance of a contract are governed by the law prevailing at the place of performance." *Musser v. Stauffer,* 192 Pa. 398, 43 A. 1018 (1899); *Atlas Credit Corp. v. Dolbow,* 193 Pa.Super. 649, 165 A.2d 704, 708 (1960). Therefore, we must look to the law of Pennsylvania, as have the parties, to determine the remaining two issues: whether there was an anticipatory breach and whether damages are recoverable.

### III. APPARENT AUTHORITY

■ The district court's finding that Waite possessed apparent authority to bind WIOO contractually is a mixed question of fact and law. We may not set aside the court's factual determinations, "unless [they are] clearly erroneous." Rule 52(a), Fed.R.Civ.P.; *see Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972). However, in determining whether the facts as found by the district court constitute apparent authority under Pennsylvania law, we may exercise an "independent review." *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 325 (3d Cir. 1975).

#### A. Creation of Apparent Authority

The district court concluded that ". . . the defendant WIOO created in F. Eugene Waite apparent authority to act as general manager of the station. . . ." WIOO argues here that the district court improperly looked to the actions of Waite rather than to the actions of WIOO in determining the existence of apparent authority.

■ Under Pennsylvania law, apparent authority flows from the conduct of the principal and not that of the agent. In *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407, 410 (1968), the Pennsylvania Supreme Court stated:

Apparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power.

*See also Jennings v. Pittsburgh Mercantile Co.,* 414 Pa. 641, 202 A.2d 51, 54 (1964); *Reading Co. v. Dredge Delaware Valley,* 468 F.2d 1161, 1163 (3d Cir. 1972).

The district court found that Waite held himself out to the public as the general manager of WIOO and that the owners of the station acquiesced in this conduct. Waite identified himself in four of the five contracts as the "general manager." Moreover, the industry-wide publications of the Standard Rate Data Service (SRDS) from February, 1967 to February, 1971 listed Waite as the general manager of WIOO.

Both owners of WIOO testified that they knew Waite used the title "general manager" and that they did not object.[5] Furthermore, the court found that the owners of WIOO signed numerous checks payable to the order of Tanner

---

414 Pa. 641, 202 A.2d 51, 54 (1964); *Southern Railway Co. v. Pickle,* 138 Tenn. 238, 197 S.W. 675, 677 (1917); *Rich Printing Co. v. Estate of McKellar,* 46 Tenn.App. 444, 330 S.W.2d 361 (1959).

**5.** Norman Swidler, Treasurer and co-owner of WIOO testified as follows:

Q. Nevertheless, Mr. Waite did use the term "general manager"?
A. Yes, he did.

Q. And you didn't really object to it?
A. That is correct.

Tr. 205–207; District Court Memorandum at 4. Thereafter, Harold Swidler, President and co-owner of WIOO testified as follows:

Q. You heard your brother, Norman Swidler, say he knew that Mr. Waite was using the title "general manager," but he didn't care. Is that the way you were, too?
A. That is right. . . .

Tr. 307.

without ever inquiring as to the reason for payment.[6]

■ These findings of fact, supported as they are by the testimony, are not "clearly erroneous" and therefore may not be disturbed. Based upon these facts, we conclude, as did the district court, that the owners of WIOO through their actions "knowingly permit[ted]" Waite to hold himself out to the public as the "general manager" of the station, *Revere Press, Inc. v. Blumberg, supra,* thereby creating in Waite apparent authority with respect to third parties.

### B. *Power to Enter Contracts*

The district court determined that WIOO created in Waite apparent authority and that ". . . a general manager under like circumstances is empowered to enter into contracts binding the corporation. . . ." WIOO argues that contracts providing for spots that were "to be valid until used" represented so unusual an agreement as to exceed the scope of whatever apparent authority was created.

■ Under Pennsylvania law, an agent may bind his principal to third persons where "his acts are within the scope of the authority which the principal has caused or permitted him to possess." *Edwards v. Heralds of Liberty,* 263 Pa. 548, 107 A. 324, 325 (1919).

The district court's finding that a general manager may contractually bind a radio station is supported in the evidence. Mr. E. D. Elmore, credit mana-ger of Tanner, testified on direct examination (rebuttal) as follows:

Q. Are you familiar or not with who normally signs such contracts with the radio station?

A. Yes sir. It would be the general manager—I would say 95 percent of them, at least, are by the general manager.

Tr. 358. This testimony was uncontroverted.[7]

Elmore also testified concerning the usual nature of these contracts:

Q. Have you ever put out a contract that didn't mention anything about the time element at all, whether it was for an indefinite period, or is this the sort of thing that is important to you and you always have a stipulation?

A. That is the standard contract. It says, "valid until used" unless by agreement of the parties the contract is changed, and then it is subject to home office approval. . . .

Tr. 366–67.

■ In light of Elmore's testimony we cannot say the district court was clearly erroneous in its findings. *Krasnov v. Dinan, supra.* We also agree with the district court that these contracts granting spots for an unlimited time are not so extraordinary as to exceed the authority of a general manager or to constitute reasonable notice to a third party of the inadequacy of the general manager's power.[8]

---

6. The district court stated:

Not only were the officers in a position to check up on the man they knew to be masquerading as the general manager, but they were on actual notice of substantial dealings with Tanner. Between July 1966 (two months after the first contract was signed) and December 1970, checks totalling more than $1500 were written on the WIOO account to the order of Tanner (collectively admitted as Plaintiff's Exhibit 19). All of the checks were signed by at least one of the Swidlers . . . .

District Court Memorandum at 6–7.

7. *See Pepper Sound Studios, Inc. v. Dunn,* 306 F.Supp. 156, 158 (E.D.Mo.1969), where the district court found that the agent of a radio station possessed "apparent authority to do those things general managers of radio stations normally do." The court concluded that this apparent authority extended to the signing of a contract for promotional material identical in all respects to the one in our case.

8. In *Pepper Sound Studios, Inc. v. Dunn, supra* at 158, the district court concluded that the general manager had apparent authority to contract for promotional materials at a cost of ". . . 3,900 one-minute time spots to be used, upon request . . . ."

## C. *Reliance*

The district court found:

that Tanner entered into five contracts with the ostensible general manager of WIOO; that thereafter Tanner prepared and sent to WIOO highly personalized radio jingles and introductory tapes stylized with the WIOO logo. Moreover, the contracts all contain a clause which specifically attests that the party signing on behalf of the radio station is authorized to contractually bind the station. By a preponderance of the evidence the plaintiff established that its conduct was in response to a contract entered into by the apparent general manager of WIOO. No further evidence of reliance need to be shown.

WIOO argues that Tanner failed to establish its reliance upon the apparent authority of Waite. Here too, we may independently review the district court's finding as a mixed question of fact and law.

■ Pennsylvania law provides that a principal who has invested an agent with apparent authority is bound to "third persons who have relied thereon in good faith." *Edwards v. Heralds of Liberty, supra,* 107 A. at 325; *Schenker v. Indemnity Ins. Co.,* 340 Pa. 81, 16 A.2d 304, 306 (1940).[9]

■ Each of the five contracts signed by Tanner and Waite contained a statement that the "[s]tation official signing this agreement certifies that he has the authority to make the agreement." Indeed, as we previously noted, Elmore, credit manager of Tanner, testified that 95% of the contracts entered into with radio stations were signed by "the general manager." *See* p. 267 *supra.* These findings of fact by the district court are not "clearly erroneous." We agree with the district court that Tanner, in good

faith, relied upon the apparent authority of Waite.

Having concluded that WIOO's actions created apparent authority in Waite as general manager authorizing him to execute contracts such as those here in dispute and that Tanner reasonably relied on such authority, we hold, as did the district court, that WIOO is contractually bound to Tanner under Contract No. 5.

## IV. *ANTICIPATORY BREACH*

■ The district court concluded that "[t]he record amply supports anticipatory breach by the defendant." This conclusion was based upon evidence that

[a]mong other things, Harold Swidler, an officer of WIOO, and E. D. Elmore, of Tanner, both established that Swidler had, prior to suit, on February 23, 1971, disavowed all knowledge of the very existence of the contracts (N.T. 93–94). Further Swidler specifically told Elmore that WIOO would not run any of the Tanner spots even if sent (N.T. 93–94). Swidler testified he was unable to recall any reference to spots in their conversation. However, Elmore testified from notes which were made during and immediately after the talk, lending greater credence to his version of the telephone conversation.

WIOO contends that these facts cannot justify the conclusion that an anticipatory breach occurred. The argument proceeds: (1) WIOO's refusal to perform was made in response to unreasonable, improper demands by Tanner; (2) WIOO did not unequivocally refuse to perform; and (3) the anticipatory breach, if one occurred, was not accepted by Tanner. Since WIOO challenges only the application of the facts to the law, we may exercise an independent review of the district court's determination.

In discussing the doctrine of anticipatory breach, Pennsylvania requires as an

---

**9.** *See* Restatement (Second) of Agency § 8, comment c at 32 (1957):

Apparent authority exists only to the extent that it is reasonable for the third person

dealing with the agent to believe that the agent is authorized.

element ". . . an absolute and unequivocal refusal to perform or a distinct and positive statement of inability to do so." *McClelland v. New Amsterdam Casualty Co.*, 322 Pa. 429, 185 A. 198, 200 (1936), quoted in *McCloskey & Co. v. Minweld Steel Co.*, 220 F.2d 101, 104 (3d Cir. 1955); *see* 4 A. Corbin, Contracts § 973 (1951). That element is present here.

■ The district court relied on the testimony of Tanner's credit manager Elmore who testified from his notes as to the telephone conversation of February 23, 1971 with Harold Swidler. From that telephone conversation the district court among other things found that WIOO "would not run any of the Tanner spots, even if sent." We will not review credibility findings of the district court, *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974); *Wilkin v. Sunbeam Corp.*, 466 F.2d 714, 717 (10th Cir. 1972), and in light of the Elmore testimony, we cannot say that the district court's findings were clearly erroneous. *Krasnov v. Dinan, supra.*

■ Elmore's testimony did not reveal any unreasonable or improper demands by Tanner as WIOO contends.[10] Rather, it indicated complete repudiation of the contract by WIOO.[11] Accordingly, we reject WIOO's first two arguments.

■ Finally, WIOO argues that the court erred in holding that an anticipatory breach occurred. WIOO claims that Tanner had not "accepted" WIOO's repudiation of the contract and that absent such acceptance there can be no breach. The district court's opinion does not discuss this issue. However, because we are in as good a position as the district court to resolve his legal question, we may proceed to do so ourselves. *See Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 907 (3d Cir. 1975).

WIOO asserts that Pennsylvania law of anticipatory breach requires more than an "absolute and unequivocal refusal to perform." *McClelland v. New Amsterdam Casualty Co., supra* 185 A. at 200. It points to *McCormick v. Fidelity & Casualty Co.*, 307 Pa. 434, 161 A. 532, 533 (1932), where the Pennsylvania Supreme Court stated:

> . . . Many authorities hold, and so far as we are aware there are none to the contrary, that, whenever the unequivocal act of one of the parties evidences an intent not to fulfill his executory agreement at the time specified in it, the other party may, if he does so promptly and unequivocally, accept such breach and sue at once; but, until he does accept it, the act operates as a tender only. If he does not promptly and unequivocally accept the tender, the contract remains in full force and effect according to its terms, for the benefit of both parties to it.

*See Zuck v. McClure & Co.*, 98 Pa. 541

---

10. Even had Tanner demanded payment and "spots" under contracts no longer enforceable by a court, this would not justify total repudiation by WIOO of the still enforceable provisions.

11. Elmore testified as follows from his notes:

I have a note here. February 23, 1971. Mr. Swidler had called Julie Rogers, who was our production supervisor, regarding Prestige Plan. The note says: Swidler called Julie Rogers re "Prestige Plan"—raised Cain. Claims cancelled long ago. I called back at her request. Advised him that we had produced Prestige Plan in its entirety and shipped as per the contract on the Airplay. He said his attorney would handle. I told him, "Fine." If he would give me the number, I would call the attorney direct. He claims Waite not authorized to sign contracts. I advised him to talk to his attorney, even requested he do so. His tone and attitude changed. He then said he had not used materials, so we should take what had been paid and forget rest to keep his goodwill so we could do business with him in the future. Advised him we want all good business we can get and certainly want future dealings, but cannot do so on charity basis. He said if the powers that be at Pepper & Tanner knew about this that they would come to mutual agreement with him. I asked him what would be agreeable. He said that the only thing that would be agreeable to him would be cancellation of debt. I told him we could consider any reasonable arrangements to clear balance, payment schedule-wise, and for station to honor spots. *He advised we forget spots because would not run if sent.* (Emphasis supplied.)

(1881); *Barber Milling Co. v. Leichtham-mer*, 273 Pa. 90, 116 A. 677 (1922). Under this doctrine, a "tender" ripens into an anticipatory breach only when the aggrieved party has accepted the tender.

 Although the Pennsylvania courts have thus far not expressly rejected the doctrine of acceptance which is urged upon us by WIOO, we are persuaded that acceptance is no longer required by Pennsylvania to give rise to an anticipatory breach.[12] While the anticipatory repudiation section of the Uniform Commercial Code adopted by Pennsylvania, 12A P.S. § 2–610[13] does not govern our case,[14] nevertheless it does represent Pennsylvania's most recent expression as to the law of anticipatory breach.[15] Among other alternatives, Section 2–610(b) gives an aggrieved party the option to

> . . . resort to any remedy for breach . . . even though he has notified the repudiating party that he

would await the latter's performance and has urged the retraction. . . .

12A P.S. § 2–610(b). This negates any requirement that there must be an acceptance of an anticipatory breach.[16]

Other recognized authority has rejected the acceptance doctrine of anticipatory breach with respect to contracts not embraced within the Uniform Commercial Code as well. Relying primarily on decisions of the United States Court of Appeals in *Tri-Bullion Smelting & Development Co. v. Jacobson*, 233 F. 646 (2d Cir. 1916) and *Bu-Vi-Bar Petroleum Corp. v. Krow*, 40 F.2d 488 (10th Cir. 1930), Professor Corbin wrote:

> In a number of well-considered recent cases, this doctrine that an anticipatory repudiation is not a breach until it is accepted as such by the injured party has been repudiated. Their reasoning is convincing and they should now be accepted as having established the law. (Footnotes omitted.)

**12.** We note that the Pennsylvania Supreme Court, seven years after the decision in *McCormick v. Fidelity & Casualty Co., supra,* discussed anticipatory repudiation of a contract without reference to *McCormick* or to any requirement of acceptance. *Cameron v. Eynon,* 332 Pa. 529, 3 A.2d 423 (1939). While we recognize that *Cameron* is not an express rejection of the acceptance doctrine, it nevertheless lends support to our conclusion that the acceptance doctrine is no longer a viable aspect of Pennsylvania law.

**13.** Section 2–610 of the Uniform Commercial Code, as enacted by Pennsylvania, 12A P.S. § 2–610, states as follows:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the other, the aggrieved party may
(a) for a commercially reasonable time await performance by the repudiating party; or
(b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2–704).

**14.** The subject of Contract No. 5 is the licensing of vocal and instrumental recordings to be used on the air. It cannot be characterized as a "transaction . . . in goods" within Article 2 of the Uniform Commercial Code.

**15.** Under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a state statute is just as precedential and predictive of state law as state court decisions.

**16.** *See* Uniform Commercial Code § 2–610, Comment 1 which states:

Under the present section when such a repudiation substantially impairs the value of the contract, the aggrieved party may at any time resort to his remedies for breach
. . . . .
While this comment supports our interpretation that there is no longer a requirement of acceptance, we recognize that the Pennsylvania Bar Association Note to this section recites the pre-Code cases which apparently adhere to that requirement. Interestingly, the Bar Association Note also cites the Restatement of Contracts. Yet the Restatement, rather than supporting a doctrine of acceptance, rejects any such consideration. *See* Restatement of Contracts § 320 (1932). Hence, we do not find the Bar Association Note to the section persuasive or representative of Pennsylvania law today.

4 A. Corbin, Contracts § 981 (1951). The Restatement (Second) of Contracts § 280 (Tent. Draft No. 9, 1974), following Section 320 of the Restatement of Contracts (1932) and Section 2–610 of the Uniform Commercial Code, provides:

> The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation.

There is unanimity among the commentators that acceptance is no longer necessary to constitute an anticipatory breach.

Pennsylvania law has rejected the acceptance doctrine for anticipatory breach of contracts which come within the Uniform Commercial Code. 12A P.S. § 2–610(b). We know of no justification or logic for applying a different rule to a contract which is outside the Code. We are persuaded that Pennsylvania courts today, even in a non-Code context, would follow those legal authorities that have rejected the acceptance doctrine. In reaching this conclusion we do no more than recognize a single rule of anticipatory breach governing all contracts, within or without the Uniform Commercial Code.

 The record here reveals attempts by Tanner to secure WIOO's performance under the contracts following the telephone conversation of February 23, 1971.[17] Four months after WIOO refused to perform further, Tanner obtained local counsel to commence suit. This action began on March 13, 1972, more than a year following the referenced telephone conversation. Our finding that Pennsylvania no longer requires acceptance of an anticipatory breach leads to the conclusion that Tanner's efforts to secure performance by WIOO and its delay in filing its complaint are not fatal to its action.

### V. Damages

The district court held that WIOO was liable to Tanner under Contract No. 5 for the outstanding cash obligation of $928 and the value of "1560 one-minute spots as of the date of breach." Thus, the district court entered a judgment in favor of Tanner for $12,628.

WIOO argues that the district court erred in its award of damages with respect to the spots because (1) the amount of damages was not supported by the evidence, (2) the damage calculation failed to pro-rate the number of spots available to Tanner during the remaining life of the contract, and (3) Tanner failed to prove its loss of profits.[18] Because we agree with WIOO's third contention and, therefore, must reverse the district court's judgment as to damages, we need not address ourselves to the first two arguments.

 The question of damages following breach of a contract is one of law that is reviewable by us under the error of law standard. In Pennsylvania

> [t]he measure of damages for breach of contract is *compensation* for the loss sustained. The aggrieved party can recover nothing more than will compensate him. Plaintiffs should be placed as nearly as possible in the same position they would have occupied had there been no breach.

*Lambert v. Durallium Products Corp.*, 364 Pa. 284, 72 A.2d 66, 67 (1950). *See also In re Kellett Aircraft Corp.*, 191 F.2d 231, 236 (3d Cir. 1951); 5 A. Corbin, Contracts, § 1002 (1964). This loss may take the form of additional expenditures or failure to realize expected profit. *Hahn v. Andrews*, 182 Pa.Super. 338, 126 A.2d 519, 521 (1956).

In each case it is the burden of the party "seeking damages for breach of contract . . . to prove such dam-

---

**17.** *See* Tr. 95–97.

**18.** The district court addressed this contention in its Memorandum (p. 14) as follows:

> The defendant's argument that plaintiff failed to show actual damage is without

merit. The plaintiff established that it provided services to the defendant for which it was only partially compensated. The plaintiff need prove no further damage to itself.

ages with reasonable certainty." *Wilcox v. Regester*, 417 Pa. 475, 207 A.2d 817 (1965). However, Pennsylvania insists that

[t]here can be no award for breach of contract (except in certain cases an award of nominal damages) when there is no evidence produced by which the jury can measure the damages. Damages cannot be awarded by guess work. The Restatement of the Law of Contracts, sec. 331, lays down the following: "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." In *Rice v. Hill*, 315 Pa. 166, 172, 172 A. 289, 291, this court held: "Damages are never presumed; the plaintiff must establish by evidence such facts as will furnish a basis for their assessment, according to some definite and legal rule."

*In re Friese's Estate*, 336 Pa. 241, 9 A.2d 401, 403 (1939); *Exton Drive-In, Inc. v. Home Indemnity Co.*, 436 Pa. 480, 261 A.2d 319, 324 (1969), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970).

Here, Tanner had the burden of proving with "reasonable certainty" the loss it sustained by WIOO's refusal to provide the promised spots. To the extent that these spots had value to Tanner, their value was represented by the amount for which they could be sold to national or other advertisers.[18a] Hence, any harm resulting to Tanner as a consequence of WIOO's anticipatory breach had to be in the form of loss of future profits from the sale of the spots.

However, we find no evidence in the record as to whether Tanner had potential customers for its spots.[19] Nor is there evidence in the record as to the price at which such spots could be sold by Tanner even if customers were available.

■ Although the record reveals the prices at which WIOO offered to sell spots during various time periods, that evidence alone cannot suffice to meet Tanner's burden of proof. First, the record is barren as to whether WIOO actually sold spots during the relevant contract periods at its published sales prices. Second, and of more importance, the record is completely silent as to whether Tanner could sell spots at the same price listed by WIOO. Although WIOO's sales price may be relevant in the proof of Tanner's damages, it does not provide the "hard evidence" required for a calculation of Tanner's damages with "reasonable certainty".

Absent such evidence there is no basis other than pure speculation upon which loss of Tanner's profits can be calculated. Under these circumstances the district court erred in awarding damages to Tanner where no evidence of damages appears in the record.

## VI. Conclusion

We hold, as did the district court, that Waite had apparent authority to contractually bind WIOO and that WIOO, by an anticipatory repudiation, breached Contract No. 5 with Tanner. The district court, therefore, properly awarded damages to Tanner for $928, the outstanding cash obligation under Contract No. 5. However, the district court erred in awarding damages for the value of the spots under Contract No. 5 as Tanner failed to prove any loss of profits, let alone a loss with "reasonable certainty".

Although we affirm WIOO's liability for breach of Contract No. 5, we are nevertheless obliged to reverse the judgment in favor of Tanner because of a

---

**18a.** Chief Judge Seitz, in dissent (pp. 274–275), reasons that the spots could have been donated to a charity, thereby having value to the plaintiff as a tax deduction, or the spots could have been used by the plaintiff itself. However, no evidence supporting or even suggesting either of these two possibilities appears in the record.

**19.** The record reveals that Tanner had never requested, and hence had not sold, any spots under any of the five contracts.

failure of proof of damages. Therefore, we will reverse the judgment of the district court and direct that it vacate the judgment in favor of the plaintiff Tanner in the sum of $12,628 plus interest and in its stead enter a judgment in favor of the plaintiff Tanner in the amount of $928 with such interest as may be appropriate. Each party to bear its own costs.

SEITZ, Chief Judge (concurring and dissenting).

I concur in the majority's disposition of the apparent authority issue and in its conclusion that defendant WIOO's refusal to honor the promised spots constituted an anticipatory repudiation of the contract.[1] Unlike the majority, I find it unnecessary to predict whether a Pennsylvania court, confronted with the facts of this case, would overrule *McCormick v. Fidelity & Casualty Co.*, 307 Pa. 434, 161 A. 532 (1932) and discard the requirement announced therein of a prompt acceptance of an anticipatory breach as a precondition to a right of action prior to the date of performance.

In Pennsylvania the significance of a party's failure to accept an anticipatory repudiation is twofold: first, it results in the continuance of the obligations of the contract on both sides; and second, it enables a breaching party to retract its repudiation and complete its performance, or to take advantage of supervening circumstances which would justify its refusal to complete the contract. *See, McCormick v. Fidelity & Casualty Co., supra; Clavan v. Herman*, 285 Pa. 120, 131 A. 705 (1926); *Zuck v. Henry & McClure*, 98 Pa. 541 (1881). Neither consequence is evident in this case. The injured plaintiff had already fulfilled its contractual duties prior to the breach, or shortly thereafter, by providing all the radio jingles and promotional material specified in the contract, and the defendant at no time has sought to retract its repudiation and complete its promised performance.

Assuming, however, that a Pennsylvania court would nevertheless require a prompt acceptance of an anticipatory repudiation under these circumstances, I believe that the plaintiff satisfactorily fulfilled this requirement by bringing suit before the defendant prejudicially changed its position. Professor Corbin, while critical of the acceptance requirement as the majority points out, notes that in jurisdictions which adhere to this rule, the filing of suit is a sufficient manifestation of acceptance. 4 A. Corbin, Contracts § 981 at 940 (1951); *Accord*, 11 S. Williston, Contracts § 1321 at 127 (3d ed. 1968). I therefore conclude that plaintiff accepted the defendant's anticipatory repudiation on March 13, 1972 with its commencement of this action. Since the delay between the repudiation[2] and acceptance thereof was attributable, at least in part, to plaintiff's understandable efforts to achieve a settlement through negotiations with the defendant, and since the defendant, having received the full benefit of the plaintiff's performance under the contract, was not prejudiced by this lapse of time, I further believe that the acceptance was sufficiently prompt within the meaning of the Pennsylvania case law.

With respect to the issue of damages, I disagree that the plaintiff failed to prove with "reasonable certainty" the loss it sustained by the defendant's re-

---

1. In addition to its refusal to provide the spots of air time, the defendant had previously ceased the monthly cash payments specified as partial compensation in the contract. Plaintiff does not suggest, however, that this initial noncompliance may have resulted in a breach of the entire contract, affording a right of immediate action for damages, regardless of whether or not the breach was promptly accepted.

2. The majority and the district court both agree that the anticipatory repudiation occurred on February 23, 1971, during the telephone conversation in which WIOO announced that it would not run any of the Tanner spots, even if sent.

fusal to provide the promised spots. The majority holds that the spots had value to the plaintiff only insofar as they could be resold to advertisers, and that the sole harm suffered by plaintiff as a result of the defendant's breach was the loss of future profits from the sale of the spots.

I believe the majority's view too narrowly restricts plaintiffs recoverable damages. Additionally, it ignores the language of the contract which states that the spots are "considered *partial payment* for service(s) rendered . . . ." (emphasis added). As a payment term under the contract, plaintiff was clearly entitled to recover their reasonable value since it established that it had completed its contractual duties and had received only partial compensation in return. Unlike the majority, I believe that the spots had value aside from their potential yield on resale. For example, they could have been donated to a charity and used as a tax deduction or possibly could have been used by plaintiff itself, in the event that plaintiff elected not to resell them. In either of these situations, damages for the loss of spots would be measured by the cost of purchasing or replacing them.

I believe that plaintiff was entitled, at a minimum, to recover compensation for this loss and that the evidence of the price at which WIOO sold the spots furnished an appropriate basis for estimating their cost.[3]

Lost profits would have been a figure over and above this loss which could have been recovered if properly proved. The majority concludes that plaintiff failed in its effort to prove loss of profits, reasoning that evidence of the price at which *the defendant* could have sold spots, although relevant, was insufficient to satisfy plaintiff's burden of proving the profits it could have derived from their resale.

It is true that plaintiff offered no evidence as to whether it could have sold the spots to advertisers and as to the price which it could have obtained. This was in part a result of defendant's asserted refusal to honor the spots. To have required plaintiff to actively seek bids from prospective customers following the defendant's repudiation, would have been senseless.

Nor do I view plaintiff's failure to request spots before the breach as necessarily fatal to its claim for damages. There was testimony that the resale of spots was an increasingly significant aspect of plaintiff's business (Tr. 115–116), but that it was a "feast or famine type thing." (Tr. 365). Since the contract stipulated that the spots were to be "valid until used," I do not feel that plaintiff's failure to request any spots prior to the breach should constitute a total bar to recovery.[4]

The difficulty of accurately forecasting damages for lost profits in this case is thus readily apparent. The precise profits which the plaintiff could have attained through a resale of the spots are incapable of ascertainment because the defendant's breach thwarted any attempts to consummate a sale. The defendant, however, should not be exonerated from liability merely because its own misconduct has made the calculation of damages more difficult.

Under these circumstances I do not believe that the district court erred in utilizing the published rates at which the defendant sold spots to determine the plaintiff's damages. Williston states that profits made by others may afford a reasonable inference of an injured

---

**3.** Of course, an award based on this figure may include an unwarranted element of profit in the event the contract price was actually less than the published rates at which WIOO sold spots. I am unable to say, however, that this evidence failed to establish with "reasonable certainty" the cost of the spots.

**4.** The possibility exists, however, that the spots should be pro-rated over the remaining life of the contract.

plaintiff's loss. 11 S. Williston, Contracts § 1346A at 249 (3d ed. 1968).

It is also significant to note that the rate selected by the district court was the lowest rate at which the defendant sold one-minute spots. Spots were sold both individually and in various quantities, with the lowest price applicable to purchases in excess of 500 one-minute spots. This bulk rate corresponds roughly to a wholesale price and as such is the likely contract price which the plaintiff paid. It would have been advantageous for plaintiff to obtain spots at their "wholesale" cost and then resell them at the higher price charged by defendant for purchases of smaller quantities or at a price slightly below what the defendant would have charged. Plaintiff's profits, as in any other contract case, would have been the difference between the resale price and the contract price.

Accordingly, plaintiff argued at trial that its loss for each unsupplied spot could be estimated by averaging the lowest price at which spots could be obtained from the defendant with the highest price for which they were sold. Recognizing that there was no evidence to support plaintiff's claim that it could have resold the spots at a price in excess of the so-called wholesale price, the district court properly limited plaintiff's recovery to the lowest published value for which they could be sold.

Applying these principles, the lower court calculated the damage award as follows:

> "The value of the spots claimed by the plaintiff is based on the SRDS rate table for WIOO as of the date of breach (February 23, 1971). The testimony shows that the rate was $10.00 per one-minute spot which was reduced to $7.50 when purchased in excess of 500 spots."

The court then multiplied the $7.50 rate by the 1560 spots specified in the contract and determined the value of the spots to be $11,700.

There exists a division in authority as to the date governing the calculation of damages where an anticipatory breach has occurred. While the general rule is that damages are to be assessed on the basis of profit factors in existence at the time of performance fixed by the contract, *McJunkin Corp. v. North Carolina Gas Corp.,* 300 F.2d 794 (4th Cir. 1961), there is also authority for fixing damages as of the date of the anticipatory breach. *See, Placid Oil Co. v. Humphrey,* 244 F.2d 184 (5th Cir. 1957). This latter rule is especially appropriate in cases, such as the present, where the date of performance is indefinite. Since neither party expresses dissatisfaction with the valuation date selected by the district court, I accept that court's assumption that the spots should be valued on the basis of rates in effect on the date of breach. Contrary to the findings of the district court, however, I believe that the evidence indicated the effective rates on this date were $8.50 for single purchases of one-minute spots and $4.25 for purchases in excess of 500 spots. (Tr. 134). The rates upon which the district court based its calculation did not become effective until August 30, 1971. (Tr. 129–130). I therefore conclude that the district court should have computed the value of the spots by reference to the $4.25 price rather than the $7.50 quotation.

One final question remains for consideration. The defendant argues that since plaintiff's obligations under the contract spanned a period of 20 months, its own duty to provide spots should correspondingly be limited to 20 months. Since the breach occurred after 17 of the 20 months had elapsed and since no requests had been made during this time, defendant contends it should receive credit for 17/20's of the total number of spots that it would otherwise have been obligated to provide.

Despite the broad language of the contract which states that the spots are "valid until used", the district court determined that plaintiff could not unreasonably delay the enforcement of the contract. The court, while acknowledg-

ing that purchases and credits for radio time are almost universally restricted to one year in advance, failed to determine the reasonable duration of the defendant's obligation to provide spots. Since the district court made no specific finding on this issue and since it further made no determination as to whether it would have been reasonable for the plaintiff to request the station to run all 1560 spots during the remainder of the period following the breach, I would remand the case for further findings on the issue of whether a credit should be applied for the time during which no spots were requested.