

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2004

# Berg Chilling Sys v. Hull Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-2977

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Berg Chilling Sys v. Hull Corp" (2004). *2004 Decisions.* Paper 642.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/642

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos. 03-2977 and 03-3020

BERG CHILLING SYSTEMS, INC.;
ACCEPTANCE INSURANCE
COMPANY

v.

HULL CORPORATION;
SP INDUSTRIES, INC.,
d/b/a Hull Company,

Defendants/Third-Party
Plaintiffs

v.

VICARB, INC., ALFA LAVAL, INC.
ALFA LAVAL VICARB, JOHN L.
HULL,
LEWIS W. HULL,

Third Party Defendants

BERG CHILLING
SYSTEMS, INC.,

Appellant in No. 03-2977

BERG CHILLING SYSTEMS, INC.;
ACCEPTANCE INSURANCE
COMPANY

v.

HULL CORPORATION;
SP INDUSTRIES, INC.,
d/b/a Hull Company,

Defendants/Third-Party
Plaintiffs

v.

VICARB, INC., ALFA LAVAL, INC.
ALFA LAVAL VICARB, JOHN L.
HULL,
LEWIS W. HULL,

Third Party Defendants

SP INDUSTRIES, INC.,

Appellant in No. 03-3020

On Appeal from the United States
District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 00-05075)
Honorable Berle M. Schiller,
District Judge

Argued April 21, 2004

BEFORE: SCIRICA, Chief Judge, and
ROSENN and GREENBERG,
Circuit Judges

(Filed:    May 25,  2004)

John J. Soroko (argued)
Patrick J. Loftus
James H. Steigerwald

Duane Morris
1650 Market Street
One Liberty Place, 37th Floor
Philadelphia, PA 19103-7396

    Attorneys for Appellant-Appellee
    <u>Berg Chilling Systems, Inc.</u>

Michael O. Adelman (argued)
Rebecca S. Rimmer
Michael P. Daly
Drinker, Biddle & Reath
One Logan Square
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103-6996

    <u>Attorneys for Appellee-Appellant SP</u>
    <u>Industries, Inc.</u>

OPINION OF THE COURT

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I. FACTUAL AND PROCEDURAL HISTORY

This matter comes on before this court on appeals by Berg Chilling Systems, Inc. ("Berg") and SP Industries, Inc. ("SPI") from an order for judgment entered by the district court on June 11, 2003, following a four-day bench trial in this breach of contract action. The district court set forth its opinion in <u>Berg Chilling Systems, Inc. v. Hull Corp.</u>, No. Civ. A. 00-5075, 2003 WL 21362805 (E.D. Pa. June 10, 2003) ("<u>Berg</u>"). The case, which has an unusual international character as it implicates entities from four countries on three continents, though not all as parties, arises from the failure of a freeze drying system to perform to specifications. Though there were many factual disputes at the trial, the basic circumstances of the case are clear and we set forth the facts in the light most supportive of the district court's result.[1]

The origin of the case may be traced to March 30, 1995, when Berg, a Canadian Corporation,[2] entered into a contract with a Chinese Company named Huadu Meat Products Company ("Huadu")[3] to supply the food freeze drying system ("Equipment Contract") at a cost of $2,800,000 in United States

[1]Certain of the various orders and determinations to which we make reference have not been appealed. The parties' attorneys took some of the actions and wrote certain correspondence that we attribute to the parties.

[2]Berg's principal place of business is in Toronto, Ontario.

[3]At various points in the record reference is made to other Chinese corporate entities related to Huadu, such as the China National Overseas Trading Corporation and the Beijing World Trade Corporation. For simplicity's sake we will refer to the entities collectively as Huadu. We also note that Huadu sometimes is referred to as Hua Du.

2

dollars. The freeze drying system contained several components which Berg intended to acquire from subcontractors and suppliers. Thus, prior to entering into the Equipment Contract, Berg ascertained which manufacturers would produce the system's various component parts.[4]

Berg approached the Hull Corporation ("Hull"), a Pennsylvania entity,[5] and asked it to produce the freeze dryers, a critical component for the system. In the weeks prior to signing the Equipment Contract with Huadu, Berg was in constant contact with Hull regarding the freezer dryers' technical specifications.[6] On April 20, 1995, Berg formally agreed to purchase two freeze dryers from Hull for the Huadu freeze drying system ("Purchase Order"). Under this Purchase Order, Hull assumed responsibility for the design, manufacture, start-up and testing of the freeze dryers.[7] The freeze dryers were

---

[4]Berg manufactured one component of the freeze drying system, the blast freezers. According to the arbitration award we describe below, Huadu dealt with a Canadian company to acquire the freeze drying system in order to take advantage of financing for the purchase available through the Export Development Corporation of Canada. Thus, in the transaction Berg largely was a facilitator for financing and a coordinator for the supply of other companies' products. This unusual role in no way diminished Berg's responsibility to Huadu.

[5]Hull has its principal place of business in Pennsylvania. Hull should not be confused with the Hull Company which we describe below. Hull is not participating in this appeal.

[6]At trial Donald Berggren, the president of Berg testified:

> We would send preliminary specifications off to Hull. They would work up a quotation or specification – a specification based on the information that they received. We would take it, forward it off to our customer, Huadu, and – and then they would come back to us and ask more questions on what we had previously supplied. We then took that information, forwarded it back, and so it was a back-and-forth process of negotiation.

JA at 77.

[7]The Purchase Order incorporated the specifications of the freeze dryers set forth in the Equipment Contract between Berg and Huadu. That contract provided, "[o]nce the units are mounted in place by the end user, under supervision by the Hull Service Engineer, Hull Corporation will send a qualified engineer to check

3

required to be able to process a specified volume of food at a high quality level within a 24-hour period or, in industry terms, to meet the "through-put" specifications.

After confirming the delivery date with Hull, Berg entered into an amended agreement with Huadu specifying a delivery date of June 15, 1996, for the freeze drying apparatus. Nevertheless, the freeze dryers were not shipped until October 1996 because one of their component parts was not available. Once Hull completed manufacturing the freeze dryers, their shipping to China was delayed further when the vessel on which they were to be shipped failed on the way to pick up the equipment at the port in Camden, New Jersey. Berg, who was responsible for shipping the freeze dryers, then made arrangements for their transportation on trucks across North America to Vancouver, British Columbia, for shipment by sea to China. Unfortunately, one of the trucks, while en route to Vancouver, was involved in an accident in which one of the freeze dryers was damaged.[8] Berg did not repair the damaged freeze dryer prior to its shipment by sea to China. Rather, after the freeze dryers were shipped to

China the damaged freeze dryer was repaired at Huadu's facility in Beijing. The equipment then was installed and prepared for trial runs.

In April 1997, at the direction of a Hull service technician, preliminary testing began on the freeze drying system. This testing revealed several deficiencies in the freeze drying equipment which led Huadu in early May 1997 to send a list of concerns regarding the functioning of the machinery to Berg which, in turn, forwarded the list to Hull. Hull then responded to those concerns. Nevertheless the Hull service technician returned to the United States prior to conducting performance tests on the machinery as required by the Equipment Contract, an action leading Huadu to refuse to accept the freeze drying system.

According to Berg, during the early summer of 1997 Hull refused to cooperate with Berg and Huadu in addressing the problems with the freeze dryers.[9] Huadu obviously was

out the systems, start up the units and provide on site training for a total of 20 days." JA at 854.

[8]The principle of Murphy's Law seems to have been at work here: what can go wrong will go wrong.

[9]Berg's president testified at trial:

> We were having a very tough time obtaining cooperation [from Hull]. They didn't seem to be interested in working with us on the project. They – they were very uncooperative, and at this time, we felt that in order

4

dissatisfied and thus threatened to send the equipment back and cancel the contract. As a result of Hull's perceived lack of cooperation during that time period, Berg threatened to sue it. In late August, however, Berg and Hull began negotiating a compromise to solve the difficulties with the machinery. These negotiations culminated in the signing of a modified agreement on October 8, 1997, among Huadu, Berg and Hull designed to address the deficiencies in the Hull freeze dryers ("Modified Agreement").[10] The Modified Agreement set forth performance-level goals for the freeze dryers and the required quality level of the product, providing that "through a cooperative effort, Hull and Berg will ensure" that these standards would be met. JA at 1074. It established the end of March 1998 as the date by which the modifications would be completed and final acceptance would take place. JA at 1074.

While Hull, Berg and Huadu were addressing the problems with the freeze dryers, Hull, on August 27, 1997, entered into an Asset Purchase Agreement with SP Industries, Inc. ("SPI"), a New Jersey Corporation,[11] providing for SPI to acquire Hull's Food, Drug & Chemical Division ("FDC division") which had designed and manufactured the freeze dryers for the Huadu project. Article 1.2 of the Asset Purchase Agreement between Hull and SPI listed the purchased assets, which included "all contracts and agreements, including, without limitation, sales orders and sales contracts."[12] JA at 1825-26. Under Section 7.8, entitled Product Warranties, the agreement provided that "[p]urchaser does not hereby assume any liability to any third party claimant."[13] JA at 1849. Section 10.6 of the Asset Purchase Agreement stated, "[t]his agreement shall be governed and controlled as to validity, enforcement, interpretation, construction,

---

to satisfy our customer's concerns, that we were going to have to be looking at performing some of the modifications or changes to the equipment to try to bring it to specification.

JA at 139.

[10]Berg's president testified that its threat to sue Hull became moot after the signing of the Modified Agreement.

---

[11]SPI has its principal place of business in New Jersey.

[12]Section 1.3 of the Asset Purchase Agreement listed assets excluded from the agreement. The freeze dryers related to the Equipment Contract were not among these excluded assets.

[13]However, Berg's president testified at trial that prior to the signing of the Asset Purchase Agreement Hull's president informed Berg that any new entity would assume the liabilities of the entity being purchased.

effect and in all other respects by the internal laws of the State of New Jersey applicable to contracts made in that State." JA at 1857.

Hull and SPI closed on the sale provided for by the Asset Purchase Agreement on October 15, 1997, exactly one week after Huadu, Hull and Berg had signed the Modified Agreement. At the closing on the Asset Purchase Agreement, as a result of concerns that SPI raised about the costs of the remaining work on the Huadu freeze dryers, SPI and Hull entered into a side letter agreement relating to the Huadu project.[14] The side letter agreement, which the parties signed on the same day as the closing on the Asset Purchase Agreement, provided that SPI would complete any needed design modifications and repairs to the freeze dryers. While SPI agreed to pay the out-of-pocket costs for the repairs, Hull agreed to reimburse SPI for a portion of its expenses.[15] The side letter agreement provided that, "[e]xcept as amended

---

[14]Hull at no time during the negotiations and closing with SPI informed SPI that Berg had threatened to file suit against it in connection with the Huadu project.

[15]Hull agreed to reimburse all of SPI's out-of-pocket costs, including payments to suppliers and travel costs, while SPI agree to absorb the normal payroll expenses of the employees working to fix the freeze dryers.

hereby, the terms and provisions of the Asset Purchase Agreement shall remain in full force and effect." JA at 1890.

Hull and SPI made various public statements after signing the Asset Purchase Agreement to the end that the transaction constituted a merger of SPI and Hull's FDC division. Moreover, Lewis Hull, president of the Hull Corporation, sent a letter to Berg after the Asset Purchase Agreement was signed, but before the closing, stating that "[i]f Hull's freeze drying division should be transferred to another entity, Hull's responsibility will of course be assumed by the successor." JA at 1020.

After the closing, the FDC division of the Hull Corporation began operating as a wholly-owned subsidiary of SPI under the name Hull Company. Although SPI through the Hull Company made various modifications to the freeze dryers from late 1997 into early 1998, the dryers, at least during this period and at all times material to this litigation, did not meet the specifications contained in the Modified Agreement. Huadu, which seems to have been quite accommodating, agreed, however, to extend the date set forth in the Modified Agreement for acceptance of the freeze dryers until April 27, 1998. When it became clear that the freeze dryers would not satisfy the specifications by that date, SPI directly requested another extension from Huadu. Huadu granted the request, giving SPI until May 20, 1998, to complete modification and testing of the

freeze dryers with the understanding that this would be the final extension.

On May 13, 1998, Huadu sent a facsimile to Berg with a carbon copy to the Hull Corporation listing the freeze dryers' remaining problems. The facsimile concluded that because the freeze dryers still had "fatal weakness[es]" that prevented them from meeting the through-put requirements for freeze drying food at the contracted quality level, they were "not acceptable."[16] JA at 1113. Nevertheless,

---

[16]In a communication dated May 5, 1998, Huadu had informed Berg and the Hull Corporation that if the freeze dryers did not satisfy the specifications and could not be accepted, "we will claim for returning of goods and for our loss caused by failure of this project." JA at 1106. Section 8.8 of the Equipment Contract provided:

> If due to the Seller's responsibility the performance tests cannot reach one or several items of guarantee figures in Appendix No. 4 after three repeated performance tests, and in case no other mutual agreement can be reached, then the Buyer shall have the right to terminate the Contract partially or wholly, relative to the value of defective

neither Berg nor SPI made an attempt to fix these problems or conduct performance tests prior to the May 20, 1998 deadline. After it received this letter from Huadu, SPI notified Berg for the first time that, under Section 7.8 of the Asset Purchase Agreement between SPI and Hull, SPI had not assumed any liability for any work done by Hull or SPI pursuant to the Equipment Contract or the Modified Agreement.

In an effort to salvage the situation after Huadu refused to accept the equipment, Berg hired Walter Pebley, who had relevant expertise, to go to China and evaluate the problems with the freeze dryers. The evidence at the trial indicated that from June to December 1998, "there was a letter writing campaign between [Berg] and Huadu, as [Berg] tried to get Hull back in to do the necessary changes that they felt were required to show that the equipment could work." JA at 189-91. When Huadu refused to give Hull another opportunity to repair the equipment, Berg sent a letter to Huadu in March 1999 purporting to end any obligation under the various contracts.

Pursuant to Section 11.2 of the Equipment Contract, Huadu, on March 29, 1999, filed a request for arbitration of

---

> equipment item as other wise agree [sic].

JA at 786.

7

its claims against Berg with the Arbitration Institute of the Stockholm, Sweden, Chamber of Commerce. Huadu did not attempt to make either Hull or SPI a party to the arbitration.[17] But after it learned about the institution of the arbitration proceedings, Berg notified John Hull, the former vice chairman of the Hull Corporation and a consultant to the new Hull Company. Berg wanted Hull to participate in the proceedings and thus it sent a letter dated May 24, 2000, to John Hull informing "Hull" that it was obligated "to participate in the arbitration and defend its equipment given that it is a party to the Modified Agreement." JA at 1181. Berg requested Hull to engage in a joint defense of Huadu's claims. JA at 194. The Berg letter stated that Hull had refused to be added as a party to the arbitration or to cooperate in the defense of the arbitration. JA at 1182. As a result, Berg informed Hull:

> Accordingly, you are hereby put on notice that in the event Berg is unsuccessful in defending the arbitration Berg will be looking to Hull, and any successor company to Hull, for full contribution and indemnity with respect to

any damage award, as well as its legal and other costs. You are further put on notice that Berg will rely on Hull's refusal to defend the Claimants' allegations as precluding it from subsequently raising any such defence to the allegations in any action commenced by Berg against Hull in the event Berg is unsuccessful in defending the arbitration.

JA at 1182.

The arbitration proceedings went forward in Stockholm for approximately one year before, on March 8, 2000, Berg formally objected to the proceedings on the basis of its assertion that the Hull Corporation was a necessary and proper party to the arbitration. However, the arbitration proceedings continued without any participation from Hull or SPI.[18] On December 7, 2000, the

---

[17]This omission is understandable as Huadu's contract providing for arbitration was solely with Berg so there was no way that Huadu could join Hull or SPI in the arbitration.

---

[18]Berg formally informed SPI of the arbitration by letter dated October 3, 2000, in which it stated that the letter, as well as the previous letter of May 24, 2000, to John Hull, "constitutes written notice of the Arbitration Proceeding." JA at 1179. The letter further stated that "Berg Chilling hereby requests that you come in and defend the Arbitration Proceeding. Should you not do so, you will be bound in any action brought

Arbitration Institute issued its award in favor of Huadu and against Berg for $2,494,034.84, a sum that includes interest.

The arbitrators found that due to the inability of the Hull freeze dryers to function as required by the specifications of the Equipment Contract and Modified Agreement, Huadu was entitled to a refund of the portion of the purchase price in the Equipment Contract for the freeze dryers but that Berg, upon payment, could reclaim them. Although the arbitrators recognized that the remainder of the freeze drying system was functional and the only deficiency was in the Hull-manufactured freeze dryers, it found that "Berg Chilling bears full responsibility towards [Huadu] for any breaches of contract with relation to the Hull equipment. It is outside the scope of this arbitration to determine whether and to what extent Hull shall answer for such breaches in relation to Berg Chilling." JA at 1206-07. In defending itself in the arbitration Berg incurred legal fees, including expert witness fees and costs, of $454,115.26.

At the time the arbitration proceedings between Huadu and Berg were pending, Berg, on October 6, 2000, brought suit against the Hull Corporation

against you by Berg Chilling as to any determination of fact made in the Arbitration Proceeding common to the two litigations." JA at 1179.

and SPI in the district court, asserting claims for breach of contract, breach of express warranty, breach of implied warranty, and indemnity and contribution. Hull then filed a cross-claim against SPI for indemnity or contribution. SPI responded by filing a counter-cross-claim against the Hull Corporation for breach of representation and warranty and breach of the indemnification and defense provisions of the Asset Purchase Agreement between SPI and Hull.[19]

After the conclusion of the arbitration proceedings and prior to trial in the district court, Berg and Huadu on June 10, 2002, entered into a Settlement Contract resolving all claims between them. In the Settlement Contract Berg

---

[19]SPI also filed a third-party complaint against the Hull Corporation's corporate officers John Hull and Lewis Hull for breach of contract, fraud and misrepresentation. John Hull and Lewis Hull then filed a counterclaim against SPI, maintaining that SPI had a duty to defend and/or indemnify them in this litigation. The district court entered judgment in favor of John Hull and Lewis Hull on SPI's third-party complaint against them and entered judgment in favor of SPI and against John Hull and Lewis Hull on John Hull and Lewis Hulls' third-party complaint against SPI. These dispositions are not at issue on this appeal and thus we do not make further reference to them.

agreed to pay Huadu $1,000,000 and to permit Huadu to retain ownership of the freeze dryers which Huadu and Berg agreed in their then current condition were valued at $650,000. We refer to this $650,000 as an "Equipment Credit." Thus, Berg and Huadu valued the settlement at $1,650,000. The Settlement Contract provided that in the event that Berg was successful in this litigation, it would retain the first $1,650,000 of the award, Huadu would be entitled to the next $350,000, and Berg and Huadu would share equally in any recovery in excess of $2,000,000. The $1,650,000 figure clearly was predicated on the payment that Berg made to Huadu in a combination of cash and the waiver of any claim by Berg to reclaim the equipment.

The litigation in the district court proceeded to trial on January 13, 2003, where the court at the bench trial heard four days of testimony. In its Memorandum and Order of June 11, 2003, the district court issued its findings of fact and conclusions of law. The court determined that the award issued on December 7, 2000, by the Arbitration Institute was not binding on Hull because Berg failed to vouch it in properly. It further held that SPI was not equitably or judicially estopped from arguing that it did not assume any liability to Berg for the freeze dryers sold to Huadu. Berg does not challenge these findings on this appeal.[20] The court further found that under the terms of the Asset Purchase Agreement between SPI and Hull, SPI assumed Hull's responsibilities for the freeze dryers pursuant to the Purchase Order, the Equipment Contract and the Modified Agreement.

Concluding that Berg, Hull and SPI were equally at fault for the breach of the various agreements to Huadu, the court apportioned the $1,000,000 damages from the Settlement Contract equally but separately among Berg, Hull and SPI.[21] The court, however, did not hold Hull and SPI jointly and severally liable to Berg. Moreover, the court declined to grant Berg damages predicated on the $650,000 Equipment Credit for the freeze dryers which Huadu had retained pursuant to the Settlement Contract because, in the court's view, Berg had not established the value of the equipment and did not demonstrate what its costs would have been to retrieve the equipment or find a purchaser for it if Huadu had not retained it.

---

[20]Berg does assert that the court's ruling with respect to vouching in was erroneous but indicates that it became moot when the court later found "that SPI and Hull had committed a breach of contract." Berg br. at 52.

[21]The court entered separate judgments in favor of Berg and against Hull and SPI for $333,333. Thus, the court left Berg with the loss for the remaining $333,334 paid on the Settlement Contract.

The district court rejected Berg's claim for attorneys' fees and expert witness fees in the arbitration proceedings, finding that "[w]hile ordinarily Berg Chilling might be entitled to recover such fees, in this case such an award would be unconscionable." Berg, 2003 WL 21362805, at *11. In support of this conclusion the court explained that Berg had not represented Hull and SPIs' interests adequately in the arbitration proceedings. The court also stated that "since Berg Chilling was equally liable with the Defendants herein, each must bear its own costs and counsel fees." Id. The court further found that the Hull Corporation had not breached certain portions of the Asset Purchase Agreement with SPI by failing to inform SPI of Berg's threat of litigation during the summer of 1997. Additionally, it rejected SPI's claim for indemnification against Hull. These appeals followed.[22] In our opinion we deal with the specific issues advanced by the parties. The Hull Corporation is not participating in this appeal.[23]

---

[22]The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332 and we have jurisdiction under 28 U.S.C. § 1291.

[23]It appears that the Hull Corporation is in financial distress and thus, according to Berg, the judgment against it is not collectible. We are aware, however, that Hull is seeking insurance indemnification and consequently it is possible that ultimately a judgment

## II. DISCUSSION

### A. STANDARDS OF REVIEW

We exercise plenary review over the district court's legal determinations. Shire US Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003). Our standard of review is plenary with respect to whether the district court applied the appropriate measure of contract damages in a legal sense. Scully v. US WATS, Inc., 238 F.3d 497, 507 (3d Cir. 2001) (citing William B. Tanner Co. v. WIOO, Inc., 528 F.2d 262, 271 (3d Cir. 1975)). We review the factual determinations of the district court under a clearly erroneous standard. Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 53 (3d Cir. 2001). A finding of fact is clearly erroneous when it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 353 (3d Cir. 2002) (quoting Hoots v. Pennsylvania, 703 F.2d 722, 725 (3d Cir. 1983)).

### B. FAULT AND THE EQUAL

---

against it would be satisfied. See Berg Chilling Sys. Inc. v. Hull Corp., 70 Fed. Appx. 620 (3d Cir. 2003).

11

APPORTIONMENT OF
DAMAGES AMONG BERG,
HULL AND SPI

Berg challenges the district court's action in allocating damages to it. The court found that under S.J. Groves & Sons Co. v. Warner Co., 576 F.2d 524, 527-58 (3d Cir. 1978), it had the authority to apportion damages according to the relative fault of the three parties, Berg, Hull and SPI. We conclude, however, that it had no basis on which to find Berg at fault for the breach of the Equipment Contract and Modified Agreement, and thus the court erred in apportioning any damages to Berg.

The court found that Berg, Hull and SPI were equally at fault for the breach of contract in failing to make a timely shipment of a working freeze drying system to Huadu. In finding that Berg was partly to blame for the breach of contract the court rejected Berg's argument that it was a mere "middleman" between Huadu and Hull.[24] Berg, 2003 WL 21362805, at *11. The court found that Berg was responsible for the late shipment of the machinery and the damage to one of the freeze dryers during shipment. The court further emphasized that, "[m]ore importantly, Berg Chilling, like Hull Corporation and SPI, took part in the design and/or approval of the design of the freeze

dryers and modification thereto." Id. In support of this finding, the court cited the testimony of Donald Berggren, the president of Berg. At the trial, Berggren testified as to the process of negotiation with Huadu and Hull prior to Berg entering into the contract with Huadu to provide the freeze drying system, indicating that "[w]e would send preliminary specifications off to Hull." JA at 77.

Though it is unclear from the foregoing portion of Berggren's testimony whether Huadu or Berg developed the specifications, review of his testimony as a whole makes it clear that Berg did not develop the specifications for the freeze dryers, but merely forwarded the specifications requested by Huadu to Hull during the negotiations.[25] On direct examination, Berggren was asked "[i]n the back and forth that you described with Huadu, did Berg Chilling provide technical input on the freeze dryers." JA at 82. He responded "[w]e weren't capable of

---

[24]In essence this conclusion rejected the view of the Arbitration Institute.

---

[25]Berggren testified, "Huadu read through the quote, and there was usually generated more – more questions. Every time we'd send off technical specifications, it generated more questions that we would in turn send off to the various suppliers that – that we had." JA at 81. Berggren's testimony is corroborated by the testimony of Wayne Hinton, the sales manager at Berg who worked on the Huadu project.

12

providing technical input. We relied on Hull for that." JA at 82.

Berg maintains that the finding by the district court that Berg "took part in the design and/or approval of the design of the freeze dryers and modification thereto," was clearly erroneous. We agree. Neither the court nor SPI points to evidence supporting a conclusion that Berg played any role other than relaying information back and forth between Huadu and Hull regarding the specifications of the freeze dryers. In arguing that we should affirm the district court on this point SPI cites to the portion of the trial transcript on which the district court relied. However, as stated above, Berggren made clear that Berg did not approve the design of the freeze dryers in the sense of judging its efficacy, but only forwarded the specifications requested by its customer, Huadu, to its supplier, Hull, and attempted to put together an agreement relying on other entities' capabilities. All of the testimony at the trial established that Hull designed the freeze dryers and attempted to install them successfully in China. Furthermore, after the closing of the Asset Purchase Agreement, SPI performed all of the obligations of Hull under the Modified Agreement.[26]

_____

[26]In its brief, SPI cites to a memo written by Berg's president to John Hull of the Hull Corporation dated September 29, 1997. As a means of reaching a compromise solution in the face of the

Indeed, the court recognized that "SPI performed all work under the Modified Agreement, including the flawed engineering of the modified freeze-dryers, the unsuccessful preliminary testing of the equipment, and the start-up activities at the Huadu facility." Berg, 2003 WL 21362805, at *11.

Berg disputes the district court's findings as to its culpability for the breach of the Equipment Contract with Huadu in other respects as well. The court found that Berg was partially responsible for the breach of contract because it delivered the freeze dryers late to China and one of the dryers was damaged while being transported to Vancouver for shipment. While we agree that Berg's late shipment of the machinery qualified as a breach of contract, this approximately one-month delay was not the reason that Huadu ultimately refused to accept the equipment. The record is clear that Hull's difficulty in obtaining a component of the freeze dryers caused most of the delay prior to shipment. Furthermore, any delay prior to the

_____

initial failure of the freeze dryers, Berg offered to "provide on-site labor to make the necessary refrigeration piping changes to accommodate the new condensers." JA at 2015. But SPI did not offer evidence that any Berg personnel ever undertook any design or modification work pursuant to the Modified Agreement.

13

signing of the Modified Agreement which extended the deadlines for the completion of the project is irrelevant because Huadu did not refuse to accept the freeze drying machinery in May 1998 on account of the late delivery in 1997. Rather, it refused to accept the equipment because, even after the various modifications, the freeze dryers failed to perform to specifications. Therefore, any breach of the delivery dates by Berg set forth in the original Equipment Contract should not have been a basis for finding Berg in any way responsible for the failure of the freeze drying apparatus to function properly.

Moreover there is no evidence that the damage during the accident while the equipment was being transported to Vancouver caused the problems with the freeze dryers. In fact, only one of the freeze dryers was involved in the accident but the record clearly shows that the freeze dryer problems related to both dryers. Thus, Huadu declined to accept the freeze dryers because neither could satisfy the through-put requirements in the Equipment Contract by reason of a design defect in both pieces of machinery. Clearly, the design of the freeze dryers by Hull rather than the accident was the cause of the equipment's failure to function as promised.[27] Overall, we are constrained to conclude that the factual findings of the district court with respect to Berg's fault for the breach of the Equipment Contract and the Modified Agreement lack evidentiary support and thus are clearly erroneous.

We recognize that, as the Arbitration Institute found, while Berg was certainly liable to Huadu as a signatory to the Equipment Contract and Modified Agreement for the failure of the freeze dryers to function as required by those agreements, such liability was imposed merely because it did not comply with the contract. But Berg's liability differs in nature from that of Hull which was culpable because of its technological failures and which as between Berg and Hull was responsible for the freeze dryers not functioning as required by the specifications in the Equipment Contract. Moreover, if, on the remand we are ordering, SPI is held liable on a theory that it is Hull's successor SPI will be in the same position as Hull. Overall, therefore, it is clear that among Berg, Hull and SPI no damages should have been assessed against Berg. Thus, the district court clearly erred in apportioning any

---

[27]The district court implicitly recognized that the deficiency with the freeze dryers related to design defects rather than the accident. The court stated that "[w]ithout remedying the problem associated with the diameter of the pipe, the freeze dryers could not have met the through-put requirements." Berg, 2003 WL 21362805, at *7.

14

damages to Berg. We therefore will reverse the judgment of the district court to the extent that it allocated any damages to Berg and will remand the case to the district court with instructions that it vacate that portion of its order for judgment holding Berg responsible for Huadu's damages.[28]

## C. THE LIABILITY AND INDEMNIFICATION TERMS OF THE ASSET PURCHASE AGREEMENT

### 1. Liability

The next issue we deal with concerns SPI's challenge to the order for judgment assessing damages against it pursuant to the Asset Purchase Agreement. Section 7.8 of the Asset Purchase Agreement states that:

---

[28]We realize that the order for judgment in terms did not hold Berg at fault but in substance it did exactly that as the court only assessed against Hull and SPI two-thirds of the $1,000,000 paid pursuant to the Settlement Contract by Berg to Huadu. In fact, the entire $1,000,000 plus, as will be seen, $650,000 for the Equipment Credit, should be assessed against Hull. Whether these also should have been assessed against SPI will have to await determination on the remand with respect to its possible successor liability.

Purchaser will, as appropriate, agree to repair (at the Real Estate or as necessary, at the location of the customer) or accept returns of products of the Business shipped by Seller on and prior to the Closing Date . . . which are defective or which fail to conform to the customer's order in accordance with the following provisions (but Purchaser does not hereby assume any liability to any third party claimant. . . .)

JA at 1848-49 (emphasis added). The district court concluded that Section 7.8 of the Asset Purchase Agreement, entitled Product Warranties, did not apply because Huadu never accepted the freeze dryers and therefore any work SPI did was not warranty work governed by Section 7.8. The court stated:

At various points during the trial and in related briefing, certain parties have referred to the work performed on the Huadu Project as 'warranty' work. Because 'warranty' work would have begun only after Huadu's final acceptance of the freeze dryers (Ex. P-20, Section 7.4) and final acceptance never actually

15

occurred, no 'warranty' work was performed. SPI argues that the work performed after the closing of the Asset Purchase Agreement is warranty work within the meaning of Section 7.8 of the Asset Purchase Agreement. Section 7.8, however, is inconsistent with Section 1.2(i) and the side letter (Ex. P-186), and, therefore, does not support SPI's contentions.

Berg, 2003 WL 21362805, at *10 n.10. Section 1.2 lists the purchased assets, and subsection (i) includes, in relevant part, "all contracts and agreements."[29] JA at 1825-26.

We reject the district court's interpretation of the Asset Purchase Agreement as it is clearly erroneous. See Medtronic, 247 F.3d at 53 n.2.[30] There is no inconsistency between Sections 7.8 and 1.2(i) of the agreement. Even assuming that the Equipment Contract and Modified Agreement constitute purchased assets under the Asset Purchase Agreement, it does not follow that SPI could not limit its liability to third parties with respect to those assets. Furthermore, the district court's analysis is flawed because in interpreting the Asset Purchase Agreement it looked to Section 7.4 of the Equipment Contract between Huadu and Berg. That provision specifies that if the freeze dryers satisfy the requirements set forth in that agreement, "[t]his shall be the Acceptance of the Equipment by the Buyer and shall be considered [the] start of the warranty period." JA at 782. Therefore, the court concluded that the warranty period on the freeze dryers had not started because Huadu never "accepted" them and as a result Section 7.8 of the Asset Purchase Agreement could not apply.

The district court did not address the obvious differences between the Asset Purchase Agreement and the Equipment Contract. For purposes of determining whether SPI assumed liability for the Huadu Project, it was irrelevant whether Huadu had "accepted" the freeze dryers in accordance with

---

[29]The district court concluded that Section 1.2 of the Asset Purchase Agreement was unambiguous and therefore the agreement between Berg and Hull to provide two freeze dryers to Huadu qualified as a purchased asset. Furthermore, Section 1.3 did not list the Huadu Equipment Contract or Modified Agreement as excluded assets.

[30]SPI regards the Section 7.8 issue as being a matter of contractual construction subject to plenary review.

---

In light of our result we need not consider this contention as the district court's conclusions cannot survive even deferential review.

16

Section 7.4 of the Equipment Contract. The relevant provision was Section 7.8 of the Asset Purchase Agreement which made clear that the limitation of liability to third parties applied to "products of the Business shipped by Seller on and prior to the Closing Date." JA at 1848-49. It is undisputed that the freeze dryers were shipped to Huadu prior to the closing of the Asset Purchase Agreement on October 15, 1997. Therefore, Section 7.8 of the Asset Purchase Agreement clearly applies to the dispute between SPI and third-party claimant Berg.

Nevertheless the district court held that because "SPI acquired the Hull Purchase Order and Modified Agreement" it was "liable for the work it performed under those contracts." JA at 24 n.13. Clearly this conclusion was incorrect as the plain language of the Asset Purchase Agreement precludes a finding of liability against SPI and in favor of Berg on the basis articulated by the district court, i.e. that SPI assumed Hull's responsibilities by entering into the Asset Purchase Agreement. Moreover, the fact that SPI did not adequately modify the equipment does not matter as Hull shipped the equipment before the Hull-SPI closing date and thus SPI could not be liable to Berg under the Asset Purchase Agreement. Accordingly, we will reverse the judgment of the district court to the extent that it imposes liability on SPI.[31]

In considering this point we have not overlooked Berg's contention "that any purported disclaimer of liability under Section 7.8 would [not] be binding on non-parties to the Hull-SPI Agreement, such as Berg." Berg's reply br. at 24. Rather, we reject that argument for if, as is the case, Berg seeks to impose liability on SPI on the basis of the Asset Purchase Agreement it cannot pick and choose which of its provisions are applicable. Thus, the exculpatory language of Section 7.8 binds Berg.

Our conclusion, however, does not necessarily free SPI from liability on a different theory inasmuch as the district court explained that "[b]ecause SPI's liability is established on this [i.e. contractual] basis, it is not necessary to reach Berg Chilling's arguments related to successor liability under the de facto merger and continuation doctrines." Berg, 2003 WL 21362805, at *10 n.13. On appeal, Berg renews its argument that even if SPI is not liable under the terms of the Asset Purchase Agreement, it should be held liable under these alternate theories. In view of the

[31]Berg maintains that Section 7.8 is void as against public policy. Inasmuch as the district court incorrectly interpreted that provision it never reached this issue. On remand, the district court should address Berg's argument in the first instance.

17

circumstance that the district court did not address the applicability of successor liability under the de facto merger and continuation doctrines, we will remand this claim to the district court for an analysis of SPI's possible liability on the applicability of these doctrines.[32]

2. Indemnification

SPI challenges the district court's refusal to grant it indemnification from Hull. Section 8.2 of the Asset Purchase Agreement provides as follows:

> 8.2 <u>Indemnification Obligations of Seller</u>. Subject to Section 8.3 hereof, Seller shall defend, indemnify, save and keep harmless Purchaser, its Affiliates and their respective successors and permitted assigns . . . against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

. . .

> (c) the failure to discharge when due any liability or obligation of Seller other than the Assumed Liabilities, or any claim against Purchaser with respect to any such liability or obligation or alleged liability or obligation;

> (d) any claims by parties other than Purchaser to the extent caused by acts or omissions of Seller on or prior to the Closing Date, including, without limitation, claims for Damages which arise or arose out of Seller's operation of the Business or by virtue of Seller's ownership of the Purchased Assets on or prior to the Closing Date[.]

JA at 1852.[33] Section 8.5 of the Asset

---

[32]The district court also should determine whether to apply New Jersey or Pennsylvania law to Berg's successor liability claims against SPI, though it may not need to make a choice if the law of the states is the same or the result would be the same under either state's law.

[33]The execution of the side letter agreement between Hull and SPI in relation to the Huadu Project did not alter SPI's rights under the Asset Purchase Agreement as that letter provided that:

> Except as amended hereby,

18

Purchase Agreement sets forth a procedure by which SPI is required to notify Hull of any third-party claim lodged against SPI. As required by this provision, after receiving a copy of the summons and complaint in this action, SPI on November 9, 2000, wrote a letter to Hull stating:

> Pursuant to Section 8.5 of the Agreement[34]

the terms and provisions of the Asset Purchase Agreement shall remain in full force and effect, it being understood that the execution of this letter agreement, and any actions taken pursuant hereto, shall in no way limit, or otherwise constitute a waiver of any of the rights to which Purchaser is entitled pursuant to the Asset Purchase Agreement including, without limitation, those provided for under Article VIII thereof.

JA at 1890.

[34]Section 8.5 of the Asset Purchase Agreement provides, in pertinent part:

> No failure by an Indemnifying Party to acknowledge in writing its indemnification obligations under this Article VIII shall relieve it of such obligations to the extent they exist. If an Indemnified Party is entitled to indemnification against a Third Party Claim, and the Indemnifying Party fails to accept a tender of, or assume, the defense of a Third Party Claim pursuant to this Section 8.5 . . . the Indemnified Party shall have the right, without prejudice to its right to indemnification hereunder, in its discretion exercised in good faith and upon advice of counsel, to contest, defend and litigate such Third Party Claim . . . . If, pursuant to this Section 8.5, the Indemnified Party so contests, defends, litigates or settles a Third Party Claim for which it is entitled to indemnification hereunder as hereinabove provided, the Indemnified Party shall be reimbursed by the Indemnifying Party for the reasonable attorneys' fees and other expenses of defending, contesting, litigating and/or settling the Third Party

19

you are hereby put on notice of the above captioned matter. Purchaser hereby tenders the defense of the above captioned matter to Seller together with Purchaser's demand for indemnification. Pursuant to Section 8.5 of the Agreement, please acknowledge your indemnification and defense obligations promptly and in writing.

JA at 1184. Hull responded on December 5, 2000, that "it does not have an obligation to tender a defense on behalf of SP Industries, Inc." in this matter. JA at 1185.

The district court rejected SPI's indemnification claim, stating that "SPI's argument is unpersuasive because SPI is liable . . . for its own post-closing conduct." Berg, 2003 WL 21362805, at

---

Claim[s] which are incurred from time to time, forthwith following the presentation to the Indemnifying Party of itemized bills for said attorneys' fees and other expenses.

JA at 1854.

*12. The court relied on Section 8.2(d) of the Asset Purchase Agreement, which provided for indemnification by Hull for actions brought by third parties related to conduct "prior to the Closing Date." JA at 1852. Therefore, the district court concluded that the actions taken by SPI in attempting to repair the freeze dryers after the closing of the Asset Purchase Agreement were not subject to the indemnification provision of that agreement.

The district court reached its conclusion as a consequence of its misinterpretation of Section 7.8, which, as explained above, expressly provided that SPI "does not hereby assume any liability to any third party claimant" for any items shipped prior to the closing of the Asset Purchase Agreement. JA at 1849. Under Section 8.2(c) Hull was obligated to defend and indemnify SPI as to any "liability or obligation of Seller." JA at 1852. Therefore, pursuant to Section 7.8, the Huadu freeze dryers qualified as a "liability or obligation" of Hull. We do not see why SPI's inability to overcome Hull's earlier failure to produce a system complying with the specifications of the Equipment Contract should impair SPI's indemnification claim. In this regard we point out that SPI's inability to modify the equipment to comply with the specifications was at most a contractual failure. We see no reason why Hull and SPI should not have been free to place the losses from the failure as between themselves as they saw fit and that is what they did in

20

Section 7.8.

Accordingly, we will reverse the order for judgment entered by the district court against SPI and in favor of Hull denying SPI's indemnification claim and will remand SPI's indemnification claim to the district court with instructions to grant judgment in favor of SPI and against Hull on this claim. The district court then must make an award pursuant to Section 8.5 of the Asset Purchase Agreement in favor of SPI and against Hull as to SPI's "reasonable attorneys' fees and other expenses of defending, contesting, [and] litigating," this action. JA at 1854.

D. BERG'S INDEMNIFICATION CLAIM AGAINST HULL AND SPI

1. Indemnification

The district court did not directly address Berg's claim for indemnification against Hull and SPI, although by finding that Berg was partially at fault for the breach of contract to Huadu, it implicitly rejected it. Therefore, the district court did not analyze whether Pennsylvania or New Jersey law applies to this claim. At the beginning of the breach of contract section of its opinion, the district court indicated that "[i]n a previous memorandum addressing the parties' motions for summary judgment, I determined that New Jersey law governs

this action." Berg, 2003 WL 21362805, at *10. However, in its prior opinion the court only held that as to any claims between Hull and SPI related to the Asset Purchase Agreement the choice of law provision in that agreement providing that New Jersey law applies governed. Berg Chilling Sys., Inc. v. Hull Corp., No. CIV. A. 00-5075, 2002 WL 31681955, at *5 (E.D. Pa. Nov. 26, 2002). Therefore, rather than addressing whether Berg's indemnification claim against both Hull and SPI also should be governed by New Jersey law, the district court merely assumed that it should be.[35]

On remand the district court must address Berg's indemnification claim against SPI in the first instance, though

---

[35]In any event, there is no conflict between Pennsylvania or New Jersey law with respect to the indemnification issue. See Duall Bldg. Restoration, Inc. v. 1143 East Jersey Ave. Assoc., Inc., 652 A.2d 1225, 1233-34 (N.J. Super. Ct. App. Div. 1995) (affirming trial court holding that paint manufacturer had duty to indemnify builder who used manufacturer's paint on a building when the paint peeled off); Moscatiello v. Pittsburgh Contractors Equip. Co., 595 A.2d 1198, 1201-02 (Pa. Super. Ct. 1991) (affirming decision that seller of concrete paving equipment was entitled to indemnification for damage award in underlying breach of contract action from manufacturer of machinery because seller was "mere conduit"). In fact Duall cited Moscatiello and followed it.

21

based on our analysis of both Pennsylvania and New Jersey law, we hold that Berg is entitled to indemnification against Hull as the manufacturer of the freeze drying equipment. As explained earlier, Berg primarily served as the distributor of the equipment and negotiated the agreement with Huadu. Hull designed the freeze dryers and shouldered the responsibility to install them. Furthermore, under the Equipment Contract and the Modified Agreement, Hull was required to conduct testing to ascertain the functionality of the equipment.

The determination of the viability of Berg's claim for indemnification from SPI must await the conclusions of the district court on remand. If the district court decides that SPI is liable as a successor to Hull under the de facto merger or continuation doctrines, the court then will have to analyze whether Berg is entitled to common law indemnification from SPI. However, if the district court rejects the successor liability claim then there will be no basis upon which Berg can assert an indemnification claim against SPI because Section 7.8 of the Asset Purchase Agreement negates the possibility of SPI assuming Hull's liability by reason of the failure of the freeze dryers which had been shipped to Huadu.[36]

---

[36]In any event, under Section 8.2 of the Asset Purchase Agreement SPI would be

## 2. Attorneys' fees and costs

Berg sought to recover its attorneys' fees and expert witness fees from Hull and SPI in connection with the defense of the arbitration proceedings in Sweden. The district court rejected this claim, stating that:

> While ordinarily Berg Chilling might be entitled to recover such fees, in this case such an award would be unconscionable. As discussed above, Berg Chilling did not adequately represent the interests of Hull Corporation, or, by extension, SPI, and for this reason it cannot recover its fees. Moreover, since Berg Chilling was equally liable with the Defendants herein, each must bear its own costs and counsel fees.

Berg, 2003 WL 21362805, at *11. The district court previously had noted that in the arbitration proceedings Berg offered the testimony of its expert, Walter Pebley, that the freeze dryers "could produce quality product but at significantly lower through-puts." JA at 519-20; see also JA at 489 (stating that he testified at the arbitration proceeding that "the equipment would function but not at the through-put rates in the

---

entitled to indemnification from Hull.

22

contract specifications"). The court characterized this as testimony offered by Berg "that the freeze dryers were improperly designed." Berg, 2003 WL 21362805, at *8. The court then concluded that "[s]uch testimony did not represent the interests of Hull Corporation."

Berg argues that the adequacy of its representation efforts in the arbitration are irrelevant in determining whether it is entitled to attorneys' fees. Inasmuch as Berg was not primarily the cause of Huadu suffering damage and Hull and SPI did not overcome the equipment's deficiencies as contemplated by the Modified Agreement, Berg contends that the district court should have awarded it all damages flowing from that failure, including reasonable attorneys' fees and costs. Berg further maintains that the court's rejection of Berg's claims was anomalous because "[t]he court disallowed as part of Berg's damages its litigation expenses in the Arbitration based on the very same testimony which the court itself later found to be true and conclusive and the basis for holding defendants liable in the instant case!" Berg's br. at 55. Berg stresses that due to the clear defects in the freeze dryers, it defended the machinery at the arbitration "as best we could." JA at 200.

SPI counters that because the district court found Berg to be at fault in part, it was not entitled to attorneys' fees and costs. SPI argues, alternatively, that in the absence of a relevant statutory or contractual provision providing for attorneys' fees, Berg cannot prevail on this claim.

As with Berg's indemnification claim against Hull and SPI, the district court did not state whether it was applying Pennsylvania or New Jersey law on the attorneys' fees and costs issue. In their briefs in this court neither Berg nor SPI directly addresses which law should apply. However, Berg relies solely upon Pennsylvania law in arguing for attorneys' fees and costs while SPI points to both New Jersey and Pennsylvania law on the indemnification issue. See Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 117 (3d Cir. 1992) (finding that under Pennsylvania law "an indemnitee may recover attorney's fees and costs incurred in defense of the liability indemnified against from the indemnitor"); McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 777 (3d Cir. 1990) (finding that New Jersey law requires a stronger showing than other states in order to overcome the presumption in New Jersey that "attorneys' fees are not a recoverable item of damages").

Inasmuch as the district court based its denial of attorneys' fees in part on its finding the Berg was partially at fault for the breach of the Equipment Contract and Modified Agreement with Huadu, we must remand this claim to that court for further consideration in light of our rejection of this finding. First, the court should address whether Pennsylvania or New Jersey law applies

to Berg's claim for attorneys' fees and costs incurred in the arbitration proceedings, though the choice may not be necessary if the court concludes that they are the same or that regardless of which state's law applies its result would be the same. The court also should address the issue of successor liability with respect to SPI to determine whether it might have any liability for attorneys' fees if Berg is entitled to them under either Pennsylvania or New Jersey law. As stated above, if SPI is not liable as a successor to Hull under either the de facto merger or continuation doctrines, then Section 7.8 of the Asset Purchase Agreement bars any liability against it, including liability for attorneys' fees and costs.

As for the claim of attorneys' fees against Hull (and SPI should the district court find it liable as a successor to Hull), the district court erred in stating that "since Berg Chilling was equally liable with the Defendants herein, each must bear its own costs and counsel fees." Berg, 2003 WL 21362805, at *11. Berg had not brought a motion for attorneys' fees incurred in the present action. Rather, it sought attorneys' fees and costs from the arbitration proceedings which arose out of the dispute involving the freeze drying equipment. As explained above, if on remand the district court determines that either Hull or SPI has a duty to indemnify Berg, such indemnification should include the reasonable attorneys' fees and expert witness fees incurred in

the arbitration proceedings.

The district court found that Berg was not entitled to attorneys' fees because it failed to represent Hull and SPIs' interests adequately in the arbitration.[37] We reject this basis for denying Berg's claim for attorneys' fees. Berg's entitlement vel non for attorneys' fees from Hull and SPI is grounded on its claim for indemnification. If Berg is entitled to indemnification from Hull, SPI or both, then the district court must analyze whether, under New Jersey or Pennsylvania law, such indemnification includes the attorneys' fees and expert witness fees incurred by Berg in the arbitration proceedings. Any consideration of the adequacy of Berg's representation of Hull and SPI in the arbitration proceedings is irrelevant.

---

[37]We question the district court's conclusion that inasmuch as Berg's testimony was "that the freeze dryers were improperly designed [the] testimony did not represent the interests of Hull Corporation." While the court's view of the testimony may be accurate, we do not believe that the viability of an indemnification claim for fees and costs should depend on the indemnitee disregarding the facts in the applicable proceeding. In short, if, as clearly was the case, Hull improperly designed the equipment then Berg was not required to fabricate a defense in the arbitration proceedings to justify its claim for indemnification.

24

Moreover, it is significant that even though Hull and SPI had received notice of the arbitration proceedings, both stood on the sidelines during them requiring Berg to defend the equipment.[38] Now Hull and SPI have engaged in Monday morning quarterbacking in assailing the defense provided by Berg. The record clearly shows that given the circumstances in which it found itself Berg defended the deficient machinery as best it could. The district court should not have rewarded Hull and SPI for their lack of participation in the arbitration proceedings.

SPI further contends that the attorneys' fees and costs which Berg expended were unreasonable. If the machinery was as deficient as Berg claimed before the district court, then, in SPI's view, Berg spent an unreasonable amount of money defending machinery that according to Berg was indefensible. Should the district court find that Berg is entitled to attorneys' fees, it must determine the appropriate amount to award. The district court should conduct a thorough analysis of the attorneys' fees and costs expended by Berg in the arbitration proceeding to determine

whether they were reasonable and to issue an appropriate award.

## E. JOINT AND SEVERAL LIABILITY

Berg maintains that the district court erred in failing to hold Hull and SPI jointly and severally liable for the $333,000 each party was required to pay to Berg. In its Memorandum and Order, the district court stated that "Berg Chilling has not provided any persuasive authority for holding defendants jointly and severally liable in a breach of contract action when the plaintiff has also been shown to have been at fault."[39] Berg, 2003 WL 21362805, at *11 n.16. Therefore, the district court entered judgment in favor of Berg and against Hull in the amount of $333,333 and in favor of Berg and against SPI for the same amount.

We need not address this issue at this time because we hold that under Section 7.8 of the Asset Purchase Agreement SPI is not liable for the defective freeze drying machinery and the issue of joint and several or only several liability ultimately may not be material in this case. As stated above, on remand the district court must address Berg's claim that SPI is liable as a successor to Hull under the de facto

---

[38] However, at one point SPI did write a letter to Berg putting forth various arguments that it should use in defending the freeze dryers during the arbitration proceedings. Berg's president testified at trial that Berg did in fact assert some of these defenses in the arbitration.

[39] As explained above, the district court erred in finding Berg partially at fault.

merger and continuation doctrines. If, after conducting this analysis the court finds that SPI is liable, it should make detailed findings of fact and conclusions of law as to whether SPI and Hull should be held jointly and severally liable.[40] On the other hand, if the district court finds that SPI is not liable to Berg as a successor to Hull under either the de facto merger or continuation doctrines, then SPI would have no liability and the issue of joint and several liability would be moot.

## F.    THE EQUIPMENT CREDIT

As stated above, when Berg entered into a Settlement Contract with Huadu, in addition to making a payment of $1,000,000, it agreed to permit Huadu to retain the freeze drying equipment. In the Settlement Contract Berg and Huadu agreed that in their current condition the freeze dryers should be valued at

---

[40]In denying Berg's claim that SPI and Hull should be held jointly and severally liable the district court did not address whether Pennsylvania or New Jersey law applies. Furthermore, the court did not analyze the prevailing case law or explain the reasons for denying relief to Berg. On remand it will have an opportunity to conduct such an analysis and reach a conclusion in accordance with our instructions if the issue is germane and its resolution is necessary.

$650,000. The court rejected Berg's claim for damages predicated on the $650,000 Equipment Credit, stating that Berg "has not established that this amount accurately reflects the value of the equipment. In addition, even if the $650,000 figure were accurate, it does not take into account the costs Berg Chilling would have incurred in retrieving the equipment and/or finding another purchaser for the equipment." Berg, 2003 WL 21362805, at *11.

Berg maintains that this finding was clearly erroneous. In support of this argument, Berg contends that the best evidence of the value of the equipment was the $650,000 value agreed to by it and Huadu in their arms-length negotiation. Berg contends that Huadu had an incentive to set the lowest possible value for the equipment because it was entitled to receive additional moneys from Berg only if Berg was successful in this action and made a recovery in excess of $1,650,000, a figure representing Berg's payment to it in cash and Huadu's right to retain the equipment. Thus, if the value had been less Huadu would have been more likely to share in a recovery in this action as its threshold for participation would have been reduced pro tanto. Berg further argues that because the freeze dryers were purchased from Hull for $1,150,000, and they could produce quality product at lower through-puts, $650,000 was a reasonable value for the equipment. Finally, Berg points to the fact that neither Hull nor SPI offered any

evidence to refute the $650,000 figure and that their position at trial was that the equipment complied with the contract specifications.

As might be expected, SPI contends that the district court's denial of the $650,000 claim for damages was not clearly erroneous. It argues that Berg failed to proffer sufficient evidence as to the value of the equipment and as a result the district court correctly declined to engage in "guess work." SPI's br. at 49.

We recognize that damages must be proven to a reasonable degree of certainty, Pugh v. Holmes, 405 A.2d 897, 909-10 (Pa. 1979); William B. Tanner Co., 528 F.2d at 271-72, though absolute precision is not required. Bigelow v. RKO Radio Pictures Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579-80 (1946). Considering the governing legal principles and the evidence presented at trial, we conclude that the district court's denial of the $650,000 in damages was clearly erroneous. While it is true that Berg did not supply evidence with respect to the value of the equipment apart from the figure it negotiated with Huadu for the Settlement Contract, still in the unusual circumstances here in which it was clearly in Huadu's interest to value the equipment at the lowest possible value in order to enhance its chances of sharing in a possible district court recovery in this case the district court should have had confidence in that figure. Furthermore, if the methodology for computation of damages is accepted,

i.e. damages in the amount of the agreed valuation of the equipment, then damages were established with precision.

We have not lost sight of the reality that it undoubtedly would have been expensive for Berg to recover the equipment, a point SPI advances.[41] Nevertheless we think that it would prove too much to deny Berg a recovery by reason of that circumstance. After all, any time that an entity makes a payment in kind it relieves itself of expenses relating to the item involved. For example, if an entity settles a dispute by conveying real estate the entity will relieve itself of expenses for taxes, maintenance and insurance. But still it is fair to say that the value of the real estate reflects the amount of the settlement. Thus, we will not deny Berg the $650,000 recovery on the theory that it saved money by leaving the equipment with Huadu.[42]

_____

[41]SPI contends that except for Huadu's retention of the equipment Berg would "have been contractually required to remove the freeze dryers from Huadu's facilities." SPI's br. at 49. SPI, however, does not refer to the contractual provision that imposes this duty. But even if it is correct our result would be the same.

[42]Berg points out that Huadu and Berg were aware that Berg avoided costs by not having to take possession of the equipment and this factor "presumably [was] considered by [them] in their arms-

27

Overall, we are satisfied that inasmuch as there was no valid reason to reject the claim for damages predicated on the value of the equipment, the district court's decision rejecting damages predicated on the Equipment Credit was "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." Kool, 300 F.3d at 353 (citation omitted). Thus, we will reverse it.[43]

_____

length negotiations in which they arrived at the market value of $650,000." Berg's br. at 62.

[43]Actually there is another possible basis to reject Berg's claim. Berg asserts that it had "rights to [the] equipment" and relinquished them to Huadu as a portion of the settlement. See, e.g., Berg's reply br. at 43. It squarely bases this right on its "payment of the [arbitration] award." Berg's br. at 3. While it is true that under the arbitration award if Berg had paid Huadu the cash awarded it could have taken the freeze dryers back, this recapture merely would have lessened the value of Huadu's recovery. Yet when Berg settled by paying the $1,000,000 and allowing Huadu to retain the equipment, it is not clear that it gave up anything it had a right to reclaim as it appears that Huadu had paid 97% of the purchase price specified in the Equipment Contract and thus we do not understand why Berg under the contract could have reclaimed the equipment. Of course, once the

III. CONCLUSION

We will reverse the order of the district court entered June 11, 2003, to the extent that we have explained and will remand the matter to the district court for further proceedings. The court erred in finding Berg equally at fault with Hull and SPI and indeed at fault at all. We therefore will remand this case for the district court to vacate that portion of its decision holding Berg equally at fault for Huadu's damages or at fault at all. Inasmuch as the district court's denial of attorneys' fees to Berg was based in part on its faulty finding that Berg was partially culpable for the defective freeze dryers, we must remand that claim as well for further consideration in light of our opinion.

The district court also erred in its interpretation of Section 7.8 of the Asset

_____

settlement was reached the parties' rights under the arbitration award were superseded. Viewed from this perspective by giving up the equipment Berg suffered no damage and thus, other than for its expenses its damages were only $1,000,000 not $1,650,000. But we make no ruling on this point for while SPI contends that Berg did not show that it was entitled to the $650,000 in damages related to the Equipment Credit, SPI predicates this contention on a theory relating to the possible value of the equipment and not on the theory we advance.

28

Purchase Agreement between Hull and SPI, and as a result incorrectly held SPI liable for breach of the Equipment Contract and Modified Agreement.[44] Under Section 7.8 of the Asset Purchase Agreement, SPI did not agree to assume any liability as to third-party claimants such as Berg for any machinery shipped prior to the closing of the agreement. Because the district court made this finding, it did not address Berg's claims that SPI was liable as a successor to Hull under the de facto merger and continuation doctrines. Accordingly, we will remand this matter for the court to consider SPI's successor liability on these theories and, if it is liable, also to consider Berg's claim that Hull and SPI should be held jointly and severally liable to it.

The court also erred in denying SPI's claim for indemnification from Hull and we accordingly will reverse the order for judgment to the extent it did so. Under Section 8.2(c) of the Asset Purchase Agreement, Hull was obligated to defend and indemnify SPI as to any "liability or obligation of Seller." On remand, the district court should vacate the order denying indemnification and should enter judgment in favor of SPI and against Hull on SPI's indemnification claim. The district court in entering the judgment should determine the reasonable attorneys' fees and costs which SPI expended in defending this litigation and issue an award pursuant to Section 8.5 of the Asset Purchase Agreement in its favor and against Hull.

We also find that Berg is entitled to indemnification from Hull and we will reverse the order for judgment to the extent that it denied that claim and will remand the matter to the district court to enter a judgment for indemnification. But Berg's claim for indemnification from SPI must await the determination of the district court on remand on Berg's successor liability arguments under the de facto merger and continuation doctrines. Finally, we will reverse the judgment to the extent that it denied Berg recovery of damages based on the $650,000 Equipment Credit and will reverse the order of the district court to the extent that it denied these damages.

As between themselves Berg and SPI shall bear their own costs on this appeal but costs shall be taxed in favor of each of them against the Hull Corporation.

[44]Berg maintains that Section 7.8 is void as against public policy. Inasmuch as the district court incorrectly interpreted that provision it never reached this issue. On remand, the district court should address Berg's argument.